913 A.2d 50

EASTSIDE VEND DISTRIBUTORS, INC.

v.

The PEPSI BOTTLING GROUP, INC.

No. 33, Sept. Term, 2006.

Court of Appeals of Maryland.

Dec. 19, 2006.

Benjamin Rosenberg (Andrew H. Baida, David M. Wyand, Hilary B. Ruley, ROsenberg, Martin, Greenberg, LLP, Baltimore, on brief), for petitioner.

James P. Ulwick (Kramon & Graham, P.A., Baltimore, Richard M. Steuer, Mayer, Brown, Rowe & Maw, LLP, New York, NY, Jay S. Brown, Charles A. Rothfeld, Mayer, Brown, Rowe & Maw, LLP, Washington, DC, all on brief), for respondent.

Michael F. Brockmeyer, Frommer Lawrence & Haug, LLP, Washington, DC, amicus curiae.

Argued before Bell, C.J., Raker, Wilner, Cathell, Harrell, Greene and Eldridge, John C. (Retired, Specially assigned), JJ.

CATHELL, J.

This case arises from the denial of a motion for preliminary injunction. On May 7, 2004, Eastside Vend Distributors, Inc. ("Eastside"), petitioner, filed a complaint in the Circuit Court for Baltimore City against Coca Cola Enterprises, Inc. ("CCE"), The Pepsi Bottling Group, Inc. ("PBG"), and Mars

Super Markets, Inc. ("Mars"). As relevant to this particular action before the Court, the complaint alleged violation of the Maryland Antitrust Act[1] ("the Act") via price discrimination on the part of the two bottling companies, CCE and PBG. It also alleged that Mars, as a supermarket, was complicit by knowingly receiving and inducing the alleged discriminatory prices in violation of the Act.[2] On March 30, 2005, Eastside filed a motion for a preliminary injunction seeking to prohibit PBG, respondent, from denying Eastside rebates on the Pepsi products that Eastside purchases from PBG.[3] The Circuit Court held a hearing on May 19 and 20, 2005. The Circuit Court denied the motion and issued an order to that effect on May 23, 2005. On May 26, 2005, Eastside timely appealed to the Court of Special Appeals. On March 20, 2006, in an unreported opinion, the Court of Special Appeals affirmed the Circuit Court's denial of Eastside's motion for preliminary injunction. On May 3, 2006, Eastside filed a petition for writ of certiorari with this Court. We granted certiorari on June 14, 2006. *Eastside Vend v. Pepsi,* 393 Md. 245, 900 A.2d 751 (2006).

Eastside presents in its brief two questions[4] for our review:

---

1. The Maryland Antitrust Act is codified in Maryland Code (1975, 2005 Repl.Vol.), §§ 11–201 *et seq.* of the Commercial Law Article. All statutory citations shall refer to that portion of the Maryland Code unless stated otherwise.

2. On September 30, 2004, CCE, joined by PBG and Mars, filed a motion to dismiss the complaint. On May 8, 2006, the Circuit Court issued an order and memorandum of decision dismissing all claims against Mars with prejudice. The motions to dismiss the claims for price discrimination against CCE and PBG were denied.

3. CCE is not a party to this appeal, though it did file an *Amicus Curiae* brief.

4. In its petition for certiorari Eastside phrased its first question differently, stating:
 "Does the Maryland Antitrust Act prohibit a manufacturer or distributor from selling its products to a purchaser at substantially higher prices than the seller charges the purchaser's competitors for the same product?"

1. "Does undisputed evidence that a manufacturer or distributor is selling its products to a purchaser at substantially higher prices than the seller charges the purchaser's competitors for the same products satisfy the likelihood of success on the merits factor in a preliminary injunction action under the Maryland Antitrust Act?

2. "Can a plaintiff seeking preliminary injunctive relief establish that it has suffered irreparable harm by showing that the defendant's actions have caused a loss of customers and goodwill, or must the plaintiff demonstrate that its business will be destroyed unless an injunction is issued?"

Our review of this case is predicated upon our determination of whether the trial court abused its discretion in denying Eastside's motion for a preliminary injunction. As part of this review, we analyze the standards for granting interlocutory injunctions. As a preliminary matter, we hold that generally injunctive relief is aimed at protecting a party, in a preventative manner, from future acts. In doing so, such injunctions are to maintain the status quo between parties until the issues in contention are fully litigated.

The facts of the case *sub judice,* as discussed below, are not sufficient, at this preliminary stage, to support the granting of a preliminary injunction. Therefore, we affirm the trial court's denial of Eastside's motion for preliminary injunction.

## I. Facts

Eastside operates a business in Baltimore City, Maryland, that sells beverages and snack food items to vending machine owners and operators [5] and other wholesale customers. Eastside has been in business for over 30 years. The company first started out as a vending machine owner and operator and

---

**5.** Unless otherwise indicated from the context where used, the term "vending machine operators" refers to businesses that maintain their own vending machines in numerous locations or businesses that distribute only to vending machine operators.

then transitioned into a niche "one-stop shop" distributor to vending machine owners and operators.[6] In recent years, however, Eastside has also begun to sell to other wholesale customers, known in the industry as "cash and carry" businesses. The cash and carry businesses that Eastside now sells to act as wholesalers to small "mom and pop" stores. As presently constituted, Eastside is essentially composed of a full-line distribution center, or warehouse. It offers its customers a comprehensive selection of items to stock their vending machines. This includes soft drinks, coffee, cocoa mixes, water, and snack foods, such as potato chips, pretzels, and candy bars. Customers can pick up their products directly from Eastside, or Eastside will deliver them.

PBG is a licensed bottler of Pepsi–Cola ("Pepsi") products, bottling and selling beverage products made under trademark licenses from PepsiCo, Inc. and other companies. The licenses govern how PBG may sell the products that it bottles and how it may license others to sell the products. For example, PBG is authorized to sell only for ultimate resale to end users (i.e., the public retail customer) when those end users are within a specific geographic boundary that composes PBG's territory. The trademark licenses that PBG operates under prohibit PBG from selling to customers that cause its products to be resold to customers outside of PBG's territory. When product from a bottler is shipped and sold to a wholesaler, there is a risk that product may be "transhipped" by that wholesaler into another bottler's territory, thereby causing a bottler to be in breach of its exclusive licensing agreements.[7]

---

**6.** From the record, it is apparent that Eastside is somewhat of a unique entity. Its original business structure as a distributor only to vending machine owners and operators sets it apart from many of PBG's other customers.

**7.** According to PBG, transhipping additionally threatens the business of a bottler for several reasons. Namely, the bottler is unable to control the quality of the transhipped products—by ensuring that the product is fresh and meets "Best if Used By" guidelines. And, the returnable plastic trays in which the product is delivered are costly and are often not returned when product is transhipped.

Eastside, under various agreements, has purchased Pepsi products from PBG for almost 30 years. Eastside's CEO, Theodore DeWald, Jr., testified that the sale of Pepsi products accounts for approximately 40 percent of Eastside's revenues. According to his testimony, in all probability, these sales are also attributable to an even greater net portion of revenue because customers who purchase Pepsi products also end up purchasing other non-Pepsi products. Eastside and PBG's business relationship has traditionally been governed by annual rebate contracts. Depending upon the terms of a particular year's contract, Eastside would receive various rebates based upon the volume of Pepsi product purchased in relation to the volume it had purchased the previous year. PBG asserts that these contracts and the resulting rebate programs associated with them, however, are designed for and offered to PBG's vending customers only. Initially, this did not cause any conflict because from the early 1980's through late 2003, Eastside's customers were only vending machine operators.[8] Beginning in October 2003, however, Eastside also began selling to cash and carry wholesale customers in addition to vending machine operators.

-------

There are possible inferences that may be drawn by a fact-finder from some evidence in the record that some of the Pepsi products wholesaled by Eastside to its purchasers may then have been resold by those purchasers to retail outlets on the Eastern Shore of Maryland—an area outside of the area licensed to PBG by PepsiCo, Inc. and in fact, licensed to another distributor. If so, that might constitute a breach of PBG's contract with PepsiCo, Inc.

8. The record is not entirely clear as to the composition of Eastside's customers. Vending machine operators are essentially businesses that own one or more vending machines or businesses that resell to other vending machine operators. They purchase the products needed to stock the machines from Eastside. End users then buy the products from the vending machines. Cash and carry businesses operate as wholesalers. They purchase products from Eastside for resale. Mom and pop stores, then, in turn, purchase the products from the cash and carry businesses. In that case, the end user is the customer that purchases products from the mom and pop store. The manner in which the product reaches the end user differs between vending machine operators and cash and carry businesses.

On May 7, 2004, as discussed above, Eastside filed a complaint in the Circuit Court for Baltimore City against several parties, including PBG, alleging, in part, that PBG was violating the Maryland Antitrust Act by engaging in unlawful price discrimination. In particular, Eastside alleged that PBG charged Eastside higher prices for Pepsi products than PBG charged other customers such as club stores (Sam's Club) [9] and supermarkets (Giant and Mars). During May 2004, Eastside was receiving rebates under a 2004 vending operator agreement. Eastside contended that, notwithstanding the rebates it was receiving, PBG was providing Pepsi products to Eastside's competitors at lower cost than Eastside could purchase the products from PBG.

The 2004 vending operator agreement provided several different base rebates, all of which were based upon Eastside meeting or exceeding the volume of product that it had purchased for the corresponding 2003 Term. Eastside would receive quarterly base rebates of $0.95 for each case of 12–ounce cans and $2.30 for each case of 20–ounce bottles that it purchased. In addition to the base rebates, the 2004 agreement provided for two tiered growth rebate schedules, one for carbonated soft drinks ("CSD") and one for non-carbonated soft drinks ("non-CSD"). For example, the CSD growth rebate schedule provided that a 1 to 5 percent increase in volume of CSD purchased would generate a $0.50 rebate for each case purchased that exceeded the 2003 volume. From 5 to 10 percent provided a $1.00 per case rebate and above 10 percent was a $1.50 rebate. The record indicates that 2004 was a banner year in sales for Eastside. Mr. DeWald testified that total sales for the company were "a little over $16 million" and volume almost doubled from 2003. Therefore, Eastside was paying, with the base rebates, $6.05 per case of cans (base price of $7.00 per case minus $0.95 base rebate) and $11.50 per case of 20–ounce bottles (base price of $13.80 per case minus $2.30 base rebate). Additionally, for all cases purchased above its 2003 volume, Eastside was receiving from $0.50 to

9. Sam's Club was never a party to these proceedings.

$1.50 per case in additional growth rebates. PBG honored the agreement throughout the course of 2004, paying Eastside all of the rebates it qualified for. The price rebates for 2004 "amount[ed] to well in excess of $1 million" for the year. The 2004 vending operator agreement terminated—per its terms—on December 25, 2004.

Early in 2005, Joe Kreft, a Senior Key Account Manager with PBG, met with Mr. DeWald to discuss a proposed 2005 vending operator agreement. This agreement, like the previous years' agreements, was uniform for that segment of PBG's client base. In other words, this was the same agreement offered to all vending operators [10] and was the only rebate program in existence for 2005 for that segment of customers.

10. It appears that PBG's "vending operator" agreements were designed only to provide rebates to vending machine operators, as defined *supra*. Eastside had been receiving rebates from PBG throughout the years. However, as time passed, Eastside's business developed and transmogrified from being itself a vending machine operator, to becoming a distributor only to vending machine operators, to its present business composition, in which it also began to sell to cash and carry wholesale customers. This apparently is the source of the conflict. It is not entirely clear from the record in this case that the upper level management at PBG was aware that the growth rebates were being paid on the growth of the cash and carry business as well as the vending operator business or that upper level management was even aware that Eastside had built up a "cash and carry business" that moved products it had been licensed to sell to vending machine operators.

While Eastside was itself a vending machine operator, its rebate agreements with PBG were in line with the purpose of the agreement, i.e., to encourage and promote vending sales of Pepsi products. Once Eastside transitioned its business to that of a distributor only to vending machine operators PBG continued to enter into rebate agreements, because Eastside's business still was limited to vending machine operators. While Eastside was no longer technically functioning as a vending machine operator itself, it was still furthering that segment of PBG's sales of Pepsi products. Once Eastside began selling to cash and carry wholesale customers in October of 2003—the impact of which may not have been readily apparent until the end of 2004, or at least may not have been entirely apparent prior to the parties entering into the 2004 agreement—Eastside's relationship as a customer changed with PBG. Eastside was no longer a vending machine operator, or in the business of selling only to vending machine operators. Therefore, the structure of the rebate agreements which it had always operated under was no longer directly applicable to its business relationship with PBG.

It offered rebates of $0.95 per case of cans and $2.40 per case of 20–ounce bottles. The growth rebate was pared down to a flat $0.50 per case rebate for any case purchased in excess of the prior year's purchases. The agreement also provided specifically that "[t]he Customer agrees that it shall *not* resell the Products to other *resellers/distributors,*" [11][emphasis added] and included new provisions requiring that the customer purchase Gatorade from PBG rather than from other sources, and requiring that at least 25 percent of the total products purchased from PBG must be non-carbonated beverages in order for the customer to receive an additional $0.25 per case rebate on all products.

Following this meeting, negotiations ensued concerning the 2005 agreement. On February 9, 2005, Eastside rejected the proposed agreement, counter-proposing with several changes. In particular, Eastside crossed out the language which prohibited resale of products purchased from PBG to other resellers/distributors, i.e., "cash and carry customers." Additionally, Eastside crossed out the provision requiring that it purchase Gatorade from PBG and modified the percentage of non-carbonated beverages that must be purchased to receive the $0.25 rebate from 25 percent to 12 percent. According to Mr. DeWald's testimony, Eastside based these changes on several factors. In regard to the provision relating to the prohibition of resale to other resellers/distributors, Mr. De-

---

11. It is apparent from the record that the language "resellers/distributors," emphasized above, was meant to pertain to Eastside's cash and carry wholesale customers only. Eastside argues, as discussed *infra,* that this provision would prevent it from receiving rebates for Pepsi products sold to its vending machine operator customers. PBG, however, contends that sales to those vending operator customers would still qualify for rebates. This is supported by the business relationship of the parties over the years. Prior to 2005, PBG had always paid Eastside rebates on its sales of Pepsi products to vending machine operators. It was not until Eastside began also selling to cash and carry wholesalers and, as a result, in 2004, Eastside's overall sales increased significantly, that PBG added the reseller/distributors limiting language to the 2005 agreement. Additionally, this is consistent with PBG's argument that Eastside's sales to the cash and carry wholesalers created a threat of possible transhipping of Pepsi product, which could thereby violate PBG's exclusive licensing agreements with PepsiCo, Inc.

Wald stated that all of Eastside's customers—vending machine operators—ostensibly could be considered resellers. They purchase Pepsi products from Eastside and then resell the products to end-users via vending machines. If he were to sign the agreement, Eastside would be in immediate breach. Additionally, Eastside supposedly had a separate contract with a subsidiary of PepsiCo, Inc. to purchase Gatorade and thus, could not commit to purchase that particular product only from PBG. As for the percentage of non-carbonated beverages, Mr. DeWald testified that non-carbonated beverages were essentially Pepsi's bottled water, Aquafina, and such products had only comprised eight percent of Eastside's purchases for the prior year—2004. Therefore, he thought that it was not reasonable to increase Eastside's purchases (and consequent sales) of that product to 25 percent of Eastside's total purchases, but that 12 percent would be attainable.

In mid-February, Mr. Kreft and another representative from PBG, Doug Aitken, visited Eastside again. The parties went through the agreement "line-by-line" and Mr. DeWald explained his reasoning for objecting to the terms discussed *supra*. The meeting concluded with no agreement.

On March 9, 2005, representatives from PBG, namely, Mr. Kreft, Mr. Aitken, and Michael Schwartz, then-Vice President for Food Services, again visited Eastside. Mr. DeWald testified as to his account of the meeting:

"Q [P]lease tell the Court what happened at this meeting.

A The beginning of the meeting, this was the first time I had ever met Mr. Schwartz and I wanted him to understand a brief history of what Eastside was, how Eastside came to be, where the business had led through the years, and where it was right now. I explained to him as to how the business operates and how we do our day to day business. We talked on several subjects of general competition in the business between Eastside and he was very interested in other competitors that we have outside the beverage world.

. . .

Q Did you talk about Sam's Club?

A Yes, we talked about the club stores and grocery stores, how they conduct business, as well as how the cash and carries and C store operators conduct their business.

Q What are C stores?

A Convenience stores, convenience and gas.

Q Are they customers of yours?

A They are customers of the cash and carries.

Q And did he—was there any discussion about whether you should or shouldn't be selling to cash and carries in this meeting?

A No, we had discussed who the cash and carries were in the area, how we dealt with them, how we sold them. PBG also sells them two liters and other products that we don't carry. We discussed different aspects as to how the general business worked with us selling to cash and carries and also the vending companies.

Q Okay. Did the subject of rebates come up?

A Yes, we talked about—we again went through the contract and pretty much line by line again discussing different aspects of the items, such as Gatorade and stuff like that. . . .

. . .

Q Did the subject of transhipping come up?

A Yes, we talked thoroughly on the subject, [w]hat transhipping is and how it effects the bottlers, how it effects their territories and their relationship with the parent company. We went through pretty much all aspects of transhipping and what effects it has on pretty much on the consumer right on all the way back to the bottler and what it has to do with the economics of the company.

Q Did Mr. Schwartz at this meeting make any suggestion or accusation that Eastside was in fact participating in transhipping?

A No sir.

Q At all?

A No.

. . .

Q Did the meeting produce any resolution of the issues that you were concerned about?

A No it did not.

Q Did there come a time when you discussed with Mr. Schwartz what the consequences to your business would be if [PBG] persisted in the course that it had taken regarding rebates?

A We had gone through the contract again line by line. When we got to the clause about the end user/consumer, I wanted Mr. Schwartz to understand that this did not apply to us. And the previous history that I had given him of the company it was pretty obvious that we did not sell to the end user. Mr. Schwartz was pretty definite that he was not paying us no matter whether I signed the contract or I didn't sign the contract, Eastside wasn't getting paid for the first three months of the first period.

Q What did that do in terms of the meeting?

A The meeting then, it was kind of ending on a sour note. Mr. Schwartz really wasn't there, he was only there to debate the (inaudible) information about the company, he really didn't want to iron out any of our issues about the contract and/or the term at hand.

Q Well what, if any, discussion was there about whether you might have alternative sources to purchase Pepsi products?

A Mr. Schwartz, when we came to the end user/consumer clause, he said that wouldn't be paid. So Eastside would then operate off of our invoice price. He said that was correct, that was the prices that he was offering me. I said; well then I just won't buy it from you. He asked where I would purchase, I said the club stores, specifically Sam's

Club was offering a cheaper price than what I was paying on invoice.

Q In other words, at that point Sam's Club was offering to the public Pepsi products at a lower price than you were able to buy them from PBG?

A That's correct.

Q And you said that to Mr. Schwartz?

A Yes.

Q And what did he say in response to that?

A He said that he doubted whether Sam's Club or any club store or any legitimate customer of PBG would sell [to] Eastside."

It is evident that the parties again reviewed the agreement and Mr. DeWald again explained his reasons for disputing the particular provisions. Mr. Schwartz discussed the threat of transhipping with Mr. DeWald and the impact that it could have upon PBG's licensing agreements. The was no evidence in the record, however, that Mr. Schwartz actually accused Eastside of transhipping. It is apparent, however, that Mr. Schwartz and PBG believed that Eastside's business composition engendered the possibility and threat of transhipping PBG's product outside of its territory. In his sworn affidavit, Mr. Schwartz stated:

"Eastside's assertion that it is operating a business that sells beverages and snack food items to vending machine operators is misleading. In reality, it operates a business that sells much of its volume to retail outlets and wholesalers [i.e., cash and carry customers] supplying retail stores, including stores outside PBG's territory. Although Eastside may still maintain the ability to supply vending machine operators, that business has been eclipsed by the business of supplying retail stores and wholesalers."

The meeting ended without any decisions being made one way or the other. The record indicates that the parties concluded their discussion on less than cordial terms, with the PBG representatives being escorted out of Eastside's building.

Correspondence was exchanged between the parties' counsel and, with no amicable resolution forthcoming, on March 30, 2005, Eastside filed a motion for a preliminary injunction prohibiting PBG from denying Eastside rebates on the Pepsi products that Eastside purchases from PBG.

On May 19 and 20, 2005, the Circuit Court held an evidentiary hearing on the motion. The court denied the motion, concluding:

"The Court has reviewed the DMF Leasing case [12] as well as other cases cited by both parties. And the Court is charged with balancing the four factors; likelihood that the Plaintiff will succeed on the merits, the balance of convenience, irreparable harm, and the public interest. The Court is charged with balancing these four factors to determine the appropriateness of which is to maintain the status quo.

"With respect to likelihood of success and irreparable harm, which are commonly regarded as the most significant factors, the Court will say the most about. However, I assure you that I have balanced all of the factors in making my determination. The issue[ ] is whether the Plaintiff has shown likelihood of success on a claim of price discrimination and the evidence is, at this preliminary stage, thin at best. The evidence is that Eastside is now and has for several years been in a category that can be characterized as a hybrid, it sells to vending machine operators and with great success in the past several years has moved into what's categorized as a cash and carry category. The Plaintiffs have argued that price discrimination is evidenced by PBGs sales of Pepsi products to Sam's Club at prices lower than sales to Eastside. The evidence of that is, I've said, scant. But even if true, under the circumstances of this case, the Court can not say that PBG has engaged in price discrimination.

"The Defendant's evidence of the price of 20 ounce Pepsi bottles indicates that Sam's Club pays more than Eastside,

---

12. *DMF Leasing, Inc. v. Budget Rent–A–Car of Maryland, Inc.*, 161 Md.App. 640, 871 A.2d 639 (2005).

the invoices presented by Eastside of sales to third parties by Sam's Club suggests that the price must be less than the Defendants indicate. However, Mr. DeWald testified that Eastside is the major distributor of Pepsi products in the Baltimore area. He's also testified that Sam's Club has targeted his business. He has testified that he sells his products below cost to keep his client base and under the fact presented it is just as reasonable for this Court to conclude that Sam's Club is selling below cost as is Eastside in an effort to syphon off Eastside's business. Accordingly, this Court does not conclude on the scant evidence presented at this hearing that PBG is engaged in price discrimination because of the price at which Sam's Club sells Pepsi 20 ounce bottles. With respect to the 11.5 ounce cans, there's no evidence that Eastside purchased the same product as Sam's Club and therefore no finding of price discrimination can be gleaned from that evidence either.

"Mars and Giant are in a business so different from Eastside as to present no valid basis for comparison of PBGs pricing schedules. In summary, the Plaintiff has failed to carry its burden to show a likelihood of success at this very preliminary stage. With respect to irreparable harm, the testimony is that Pepsi products are important to Eastside, both directly, that is for the revenue produced from resale, and indirectly, that is as a magnet that attracts customers who then purchase other products offered by Eastside.

"Testimony is that without rebates Eastside will be forced to raise its prices. A rise in prices will cause customers to look to other distributors who can offer a lower price. And eventually Eastside will be adversely impacted. Mr. De-Wald testified however that customers are attracted to Eastside not only for Pepsi products at attractive prices, but also because Eastside offers the convenience of offering multiple vending machine products in one location. There has been no quantification or even an attempt at a quantification of the effect of a higher price for Pepsi products on overall sales. And this Court can not speculate that the

harm would be substantial or irreparable, there are simply too many variables not addressed.

"Moreover, in light of the fact that the uncontroverted evidence is that Eastside's business has significantly changed in the past few years and that PBGs pricing hasn't kept pace with that change, that is that PBG sold Eastside as a distributor to vending machine operators when in fact they added cash and carry stores to their customer base for the past years. It's added to its customer base for its best years it has ever had for the past several years. In light of these facts PBG is now in early 2005 just catching up with its pricing practices. It's catching those pricing packages up to the reality of Eastside's business. And given that fact the Court can't say that Eastside is harmed at all.

"With respect to the balance of convenience measured by whether there's greater harm would be inflicted upon the Defendant by granting the injunction then would result from a refusal, this factor weighs in Eastside's favor although there was no evidence of PBGs revenues. There was evidence of the scale of its operations and this Court has no doubt that PBG could absorb the cost of paying Eastside rebates during the course of this litigation.

"With respect to the public interest, it is in this case closely tied to the likelihood of success. If there is in fact price discrimination, then the public has an interest in preventing it. If not, the public has an interest in seeing that the parties reach their own contractual agreements and [not] have those imposed upon them by the Court. As I've said, the Court has balanced all of these factors and concludes that the Plaintiff has not met its burden for issuance of a preliminary injunction and the motion is denied."

On May 23, 2005, pursuant to this ruling, the court issued an order denying Eastside's motion for a preliminary injunction.

On May 26, 2005, Eastside appealed to the Court of Special Appeals. On July 6, 2005, the Circuit Court denied Eastside's motion for an injunction pending appeal to the Court of

Special Appeals. And, on July 7, 2005, the Court of Special Appeals entered an order denying Eastside's additional motion for an injunction pending appeal.

On March 20, 2006, the Court of Special Appeals, in an unreported opinion, affirmed the decision of the Circuit Court. The Court of Special Appeals, however, disagreed with some of the Circuit Court's application of the law. In particular, the intermediate appellate court found that the balance of convenience factor weighed in favor of PBG:

"We cannot agree with the circuit court that the balance of convenience, or balancing of harms, depending upon the granting or denial of the injunction, favored Eastside. There is no doubt that Eastside will suffer losses as a result of the withholding of the rebates, and we are confident, as was the court, that [PBG], based upon 'the scale of its operations,' could easily 'absorb the cost of paying Eastside rebates.' The fact remains, however, that currently, these parties are not bound by any contractual agreement, and if this injunction were to issue, [PBG] would have to 1) revive a rebate system it discontinued for one, specific customer, and 2) be obligated on a contract to which it would not enter on its own terms. As such, we hold the balance of convenience in this case favors [PBG]."

After finding that the balance of convenience factor weighed in favor of PBG, the court focused its attention on Eastside's likelihood of success on the merits. The Court of Special Appeals agreed with the Circuit Court that, "at this stage and, under this standard, Eastside's evidence did not show a likelihood of success on the merits of its claim against [PBG]." The court then conducted an extensive review of law pertaining to the issuance of preliminary injunctions. In sum, the court stated:

"First, we review the issuance of a preliminary injunction on an abuse of discretion standard. As noted, ... failure of the party seeking the preliminary injunction to establish the existence of even one of the four factors will preclude the grant of preliminary relief. With respect to injunctions

sought to prevent termination of a contractual relationship, courts disfavor granting injunctive relief in the absence of an issue regarding the legality of the termination of an agreement or a statutory basis. Further, no relief will be granted where the harm claimed is not caused by the wrong alleged in the underlying action, even though there is a substantial show of likelihood of success at a trial on the merits, particularly where there exists an adequate remedy at law. Finally, in an appropriate case, the *status quo* is the last, actual, peaceable, non-contested status of the parties."

The Court of Special Appeals concluded:

"At the hearing on the motion and on appeal, [PBG's] position has been—and continues to be—that 'the central issue on the merits is not price discrimination, but rather failed contract negotiations.' Whether this statement of [PBG's] position is accurate, for our purposes, we have before us on this appeal two parties, who were formerly bound by a contractual arrangement which no longer has any force or effect.... In calculating the potential loss, we look to the last actual, peaceable, non-contested status of the parties and freeze in time the obligations and benefits flowing from the relationship at that time. The date of the expiration of the original Agreement was December 25, 2004 and Eastside submitted to [PBG] a contract which the latter had proposed, with substantial revisions, constituting a counteroffer on February 9, 2005. In their face-to-face meeting on March 9, 2005, all negotiations collapsed. Eastside filed its motion for preliminary injunction on March 30, 2005.

"Thus, the last peaceable, non-contested status of the parties occurred after the expiration of the Agreement at issue. Eastside therefore claims irreparable harm as a result of the termination of rebate payments provided under an Agreement that had expired by its own terms. Moreover, Eastside's claim of price discrimination has no nexus to the circumstances underlying the termination of the Agreement. The expiration date of the Agreement was established long before the anti-trust violations were alleged

to have taken place and was in no way causally related. The net result is that, notwithstanding Eastside's claim that loss of the rebate revenue will result in destruction of its business, [Eastside's] motion for a preliminary injunction must fail by reason of the inability to demonstrate irreparable harm based on a necessity to maintain the *status quo*. Stated otherwise, the *status quo*, at best, relegates [Eastside] to the position of an offeree to a proposed new Agreement, who made a counteroffer which was rejected. The benefit Eastside seeks to preserve in maintaining the *status quo, i.e.*, the rebate program, lapsed when the original Agreement expired by its own terms. Continuing the parties in their present circumstance—in which they continue in an *ad hoc* business relationship without the rebate program—in effect, constitutes the *status quo*. Accordingly, we are satisfied that Eastside has an adequate remedy at law and its motion for preliminary injunction, therefore, should be denied."

## II. Standard of Review

Our scope of review in this case is limited to determining whether the Circuit Court abused its discretion in denying Eastside's motion for preliminary injunction. *El Bey v. Moorish Science Temple of Am., Inc.*, 362 Md. 339, 354, 765 A.2d 132, 140 (2001); *Colandrea v. Wilde Lake Community Ass'n, Inc.*, 361 Md. 371, 394, 761 A.2d 899, 911 (2000). The Court recently described the abuse of discretion standard in *Dehn v. Edgecombe*, 384 Md. 606, 865 A.2d 603 (2005):

" 'Abuse of discretion' is one of those very general, amorphous terms that appellate courts use and apply with great frequency but which they have defined in many different ways.... [A] ruling reviewed under an abuse of discretion standard will not be reversed simply because the appellate court would not have made the same ruling. The decision under consideration has to be well removed from any center mark imagined by the reviewing court and beyond the fringe of what the court deems minimally acceptable. That kind of distance can arise in a number of

ways, among which are that the ruling either does not logically follow from the findings upon which it supposedly rests or has no reasonable relationship to its announced objective. That, we think, is included within the notion of 'untenable grounds,' 'violative of fact and logic,' and 'against the logic and effect of facts and inferences before the court.' "

384 Md. at 628, 865 A.2d at 616 (some quotations omitted) (quoting *North v. North,* 102 Md.App. 1, 13–14, 648 A.2d 1025, 1031–32 (1994)). *See also Gray v. State,* 388 Md. 366, 383–84, 879 A.2d 1064, 1073–74 (2005) (albeit in a criminal case).

 It is well established that the granting or denial of an interlocutory injunction is a matter resting in the sound discretion of the court. *State Dep't v. Baltimore County,* 281 Md. 548, 554, 383 A.2d 51, 55 (1977). Injunctive relief is "a preventative and protective remedy, *aimed at future acts,* and is not intended to redress past wrongs." *El Bey,* 362 Md. at 353, 765 A.2d at 139 (quotations omitted) (citing *Colandrea,* 361 Md. at 394, 761 A.2d at 911 (quoting *Carroll County Ethics Comm'n v. Lennon,* 119 Md.App. 49, 58, 703 A.2d 1338, 1342–43 (1998))). The Court set forth the standard for granting interlocutory injunctions in *Department of Transportation v. Armacost,* 299 Md. 392, 474 A.2d 191 (1984):

> "As a general rule, the appropriateness of granting an interlocutory injunction is determined by examining four factors: (1) the likelihood that the plaintiff will succeed on the merits; (2) the 'balance of convenience' determined by whether greater injury would be done to the defendant by granting the injunction than would result from its refusal; (3) whether the plaintiff will suffer irreparable injury unless the injunction is granted; and (4) the public interest. *State Dep't v. Baltimore County,* 281 Md. 548, 554–57, 383 A.2d 51 (1977).

> "[I]f the facts as stated in the bill of complaint or, when appropriate, as shown by the evidence, are not 'full and sufficiently definite and clear, in support of the right

asserted, and that such right has been violated,' the court will not order preliminary relief."

*Id.* at 554, 383 A.2d 51, *quoting from City of Baltimore v. Warren Mfg. Co.,* 59 Md. 96, 105 (1882). It is well accepted that an interlocutory injunction should not be granted unless the party seeking it demonstrates a likelihood of success on the merits. 1 *High on Injunctions* § 5 (3d ed.1905); 43 C.J.S. *Injunctions* §§ 17 and 20 (1978)."

*Armacost,* 299 Md. at 404–05, 474 A.2d at 197 (footnote omitted). "The burden of proving the facts necessary to satisfy these factors rests on the party seeking the interlocutory injunction." *Fogle v. H & G Restaurant, Inc.,* 337 Md. 441, 456, 654 A.2d 449, 456 (1995). And, "the party seeking the injunction must prove the existence of *all four* of the factors set forth in *Armacost* in order to be entitled to preliminary relief. The failure to prove the existence of even one of the four factors will preclude the grant of preliminary relief." *Fogle,* 337 Md. at 456, 654 A.2d at 456 (citations omitted). Furthermore, in regard to the "likelihood of success factor," a party seeking the interlocutory injunction "must establish that it has a real *probability* of prevailing on the merits, not merely a remote *possibility* of doing so." *Id.* at 456, 654 A.2d at 456–57.

■ Preliminary injunctions are designed to maintain the status quo between parties during the course of litigation. *Ehrlich v. Perez,* 394 Md. 691, 908 A.2d 1220 (2005); *State Dep't v. Baltimore County,* 281 Md. at 558–59, 383 A.2d at 57; *Harford Co. Educ. Ass'n v. Board,* 281 Md. 574, 585, 380 A.2d 1041, 1048 (1977) ("[I]t is fundamental that a preliminary injunction does not issue as a matter of right, but only where it is necessary in order to preserve the *status quo.*") (citations omitted) (quotations omitted); *Maloof v. Dep't of Environment,* 136 Md.App. 682, 693, 767 A.2d 372, 378 (2001). "The status quo to be preserved by a preliminary injunction has been described as 'the last, actual, peaceable, noncontested status which preceded the pending controversy.' " *State Dep't*

*v. Baltimore County,* 281 Md. at 556 n. 9, 383 A.2d at 56 n. 9 (citing 43 C.J.S. *Injunctions* § 17, at 428 & n. 90 (1945)).

■■■■ Moreover, the United States Court of Appeals for the Fourth Circuit has stated that:

> "the first step [in a trial court's determination as to whether to grant or deny a preliminary injunction] is for the court to balance the 'likelihood' of irreparable harm to the plaintiff against the 'likelihood' of harm to the defendant; and if a decided imbalance of hardship should appear in the plaintiff's favor, then the likelihood-of-success test is displaced by Judge Jerome Frank's famous formulation:
>
> > [I]t will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation.
>
> *Hamilton Watch Co. v. Benrus Watch Co.,* [206 F.2d 738, 740, 743 (2d Cir.1953)]; *Semmes Motors, Inc. v. Ford Motor Co.,* 429 F.2d 1197, 1205 (2d Cir.1970)."

*Blackwelder Furniture Co. v. Seilig Manufacturing Co.,* 550 F.2d 189, 195 (4th Cir.1977); *Lerner v. Lerner,* 306 Md. 771, 783–84, 511 A.2d 501, 507 (1986). However, "if there is no imbalance of hardship in favor of the plaintiff, then 'the probability of success begins to assume real significance,' and interim relief is more likely to require a clear showing of a likelihood of success." *Direx Israel, Ltd. v. Breakthrough Medical Corp.,* 952 F.2d 802, 808 (4th Cir.1991) (quoting *Blackwelder,* 550 F.2d at 195 n. 3). And even if the balance of hardship is found to weigh in favor of the plaintiff, it "remains merely one 'strong factor' to be weighed alongside both the likely harm to the defendant and the public interest." *Blackwelder,* 550 F.2d at 195 (citing *Dino DeLaurentiis Cinematografica, S.p.A. v. D–150, Inc.,* 366 F.2d 373, 375 (2d Cir.1966)).

## III. Discussion

Eastside argues that the Court of Special Appeals erred in its interpretation of two factors under *Armacost,* i.e., the likelihood of success on the merits and whether the plaintiff

will suffer irreparable harm unless an injunction is granted. Thus, Eastside asserts that "[p]reliminary injunctive relief is warranted because [PBG] has violated the Maryland Antitrust Act by charging Eastside significantly higher prices than [PBG] charges Eastside's competitors for the same products." In opposition, PBG argues that the Court of Special Appeals was correct in its interpretation because granting the preliminary injunction would alter, rather than maintain, the status quo and, in addition, based upon the "scant" evidence presented, Eastside "failed to carry its burden to establish all four factors required under" *Armacost.* As a result, PBG asserts that the Court of Special Appeals was correct in finding no abuse of discretion by the trial court.

### Denial of the Motion for Preliminary Injunction

█ Our review of the case *sub judice* is based upon whether the Circuit Court abused its discretion in denying Eastside's motion for a preliminary injunction. While we disagree with some of the Circuit Court's application of the law to its ruling, it did not commit an abuse of discretion. In this case, the ruling—denial of the motion for preliminary injunction—logically follows from the findings upon which it rests. *See Dehn,* 384 Md. at 628, 865 A.2d at 616.

█ First and foremost, it must be reiterated that injunctive relief is "a preventative and protective remedy, *aimed at future acts,* and is not intended to redress past wrongs." *El Bey,* 362 Md. at 353, 765 A.2d at 139 (citations omitted) (quotations omitted). For this reason alone, the Circuit Court was correct in denying the motion. Eastside contends that it seeks through a preliminary injunction to ameliorate the effect of PBG's alleged price discrimination. The relief requested by Eastside's motion, however, does not serve to alleviate the alleged price discrimination asserted by Eastside in its complaint.

Eastside filed its complaint on May 7, 2004, while it was still receiving rebates pursuant to its 2004 vending operator agreement. It continued to receive rebates throughout 2004 until

December 25 of that year, when the agreement terminated of its own accord. It was only when negotiations broke down concerning the 2005 agreement, in March 2005, that Eastside filed this motion for a preliminary injunction. In its memorandum in support of its motion for a preliminary injunction Eastside specifically asked for relief in the form of "a preliminary injunction prohibiting [PBG] from excluding Eastside from any and all rebate programs and requiring [PBG] to pay Eastside the same rebates that [PBG] previously offered Eastside and is continuing to offer Eastside's competitors." In addition, Eastside's proposed order stated that "[PBG] shall pay rebates to Eastside for all rebate periods ... according to the same terms and conditions as Eastside received such rebates during the period of September 5, 2004 through December 25, 2004."

Eastside contends that "restoration of the rebates was not the ultimate or only objective of Eastside's request for injunctive relief." And that "[r]einstating the rebates was simply one of several ways to accomplish" an abatement of PBG's alleged unlawful price discrimination. This assertion, however, is contrary to the overall tenor of Eastside's argument. Eastside's entire argument is driven by the discussion of rebates.[13]

A contractual agreement pertaining to rebates ceased to exist on December 25, 2004. Requiring PBG to pay Eastside rebates when they had neither been doing so, nor were required to do so for almost three months, is not a preventative and protective remedy. This injunction, were it to be granted, would not be protecting Eastside from some future act of PBG. Rather, it would be forcing PBG to reinstate a contract that both parties agreed would terminate on December 25, 2004. This goes to the balance of hardships equation, as well as to whether an injunction would serve to maintain the status quo. We shall later address each in turn.

---

13. Eastside argues that the court could impose other relief to abate the alleged price discrimination, i.e., PBG could lower Eastside's invoice price or raise the price that it charges Eastside's competitors.

Additionally, PBG argues that Eastside's motion for preliminary injunction is entirely about rebate checks and the terminated contractual relationship under which rebates were paid—not about price discrimination.[14] We agree. PBG stated that the loss of rebates as a result of the collapse of contractual negotiations "cannot be remedied under a theory of price discrimination, and accordingly there is no likelihood that Eastside will prevail on its claim," citing two cases in support. *See Omega World Travel, Inc. v. Trans World Airlines*, 111 F.3d 14, 16 (4th Cir.1997) ("[A] preliminary injunction may never issue to prevent an injury or harm which not even the moving party contends was caused by the wrong claimed in the underlying action."); *Devose v. Herrington*, 42 F.3d 470, 471 (8th Cir.1994).

 The first step in determining whether to grant or deny a motion for preliminary injunction is "to balance the 'likelihood' of irreparable harm to the plaintiff against the 'likelihood' of harm to the defendant," i.e., the balance of hardships. *Blackwelder*, 550 F.2d at 195. We agree with the

---

**14.** PBG argues that the motion for preliminary injunction is not based on price discrimination, but rather on rebates—in particular, those rebates provided for in the 2004 agreement. This argument lends itself to the underlying situation extant in the case *sub judice*. The rebates Eastside received through 2004 were premised on Eastside being a "vending operator," as defined *supra*, or selling only to vending owners and operators, as discussed *supra*. The facts show that Eastside changed its business model in October of 2003. At that time, a large portion of its business began to encompass cash and carry wholesale businesses. Throughout 2004, Eastside was receiving vending rebates on its sales to these non-vending customers. This apparently operated greatly to Eastside's benefit as 2004 was its best sales year ever.

PBG has the right to decide with whom it transacts business. To that effect, once the 2004 agreement terminated, PBG could have made the decision not to sell any Pepsi products to Eastside. PBG, however, offered Eastside a 2005 agreement which provided for rebates, subject to certain criteria. Eastside had the ability to negotiate that contract, but negotiations fell through. Eastside does not now have the right to force PBG to pay rebates based upon the terminated 2004 agreement, an agreement Eastside may have violated by selling to "cash and carry customers" and receiving rebates intended to apply only to its business of distributing to vending machine operators.

Court of Special Appeals that the balance of hardships did not favor Eastside, it favored PBG: .

"The fact remains, however, that currently, these parties are not bound by any contractual agreement, and if this injunction were to issue, [PBG] would have to 1) revive a rebate system it discontinued for one, specific customer, and 2) be obligated on a contract to which it would not enter on its own terms. As such, we hold the balance of convenience in this case favors [PBG]."

Eastside's inability to receive rebates during the period subsequent to the termination of the 2004 agreement may have been detrimental to its business, but any such detriment does not outweigh the hardship that would be imposed on PBG if it was forced to pay rebates for which it was not contractually obligated. Therefore, under our finding that the balance of hardships weighs in favor of PBG, "interim relief is more likely to require a clear showing of a likelihood of success." *Direx Israel, Ltd.*, 952 F.2d at 808.

Additionally, it is important to discuss whether the granting of a preliminary injunction would maintain the status quo in the case *sub judice*. As stated *supra*, "it is fundamental that a preliminary injunction does not issue as a matter of right, but only where it is necessary in order to preserve the *status quo*." *Harford Co. Educ. Ass'n*, 281 Md. at 585, 380 A.2d at 1048. In order to resolve this, we must first establish what the status quo was in this case. Ordinarily, the status quo is the last, actual, peaceable, non-contested status which preceded the pending controversy. *State Dep't v. Baltimore County*, 281 Md. at 556 n. 9, 383 A.2d at 56 n. 9. The Court of Special Appeals found that "the last peaceable, non-contested status of the parties occurred after the expiration of the [2004 vending operator agreement]." In the present posture of the case, the pending controversy is the denial by the trial court of Eastside's request for a preliminary injunction.

Even if the pending controversy in this case is the underlying complaint concerning price discrimination, which was filed on May 7, 2004, Eastside entered into the 2004 vending

operator agreement with PBG, effective, March 21, 2004—prior to filing the complaint and initiating the pending controversy. Therefore, the 2004 agreement was freely negotiated before the complaint was filed, at which time the status of the parties was peaceable and non-contested. It is uncontroverted that the 2004 agreement, and any rebates received thereunder, would terminate by its own freely negotiated terms on December 25, 2004.

The facts indicate that PBG fully complied with all of the terms of the 2004 agreement, throughout the course of the pending price discrimination controversy. At the time it was executed, there was no guarantee or requirement that PBG would continue to offer Eastside rebates following the termination of the 2004 agreement or that it would even agree to any further contracts. As such, the Court of Special Appeals correctly determined that "Eastside's claim of price discrimination has no nexus to the circumstances underlying the termination of the Agreement. The expiration date of the Agreement was established long before the anti-trust violations were alleged to have taken place and was in no way causally related." The agreement was not terminated as a result of Eastside's price discrimination allegations and claims, but by the agreement's own predetermined date. We agree with the court's finding that "the benefit Eastside seeks to preserve in maintaining the *status quo, i.e.,* the rebate program, lapsed when the original Agreement expired by its own terms. Continuing the parties in their present circumstance—in which they continue in an *ad hoc* business relationship without the rebate program—in effect, constitutes the *status quo.*" The status quo was that the 2004 agreement, which provided for rebates, would terminate on December 25, 2004. Forcing PBG to pay Eastside rebates via a preliminary injunction would have the effect of altering the status quo of the parties, which would be contrary to the purpose of preliminary injunctions. Therefore, the motion was properly denied.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS IN THIS COURT AND IN THE**

248

COURT OF SPECIAL APPEALS TO BE PAID BY THE PETITIONER.