930 A.2d 304

Linda SCHADE, et al.

v.

MARYLAND STATE BOARD OF ELECTIONS, et al.

No. 64, Sept. Term, 2004.

Court of Appeals of Maryland.

Aug. 24, 2007.

■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

**4**

———

Ryan P. Phair (Laura A. Thomas, Kathryn R. DeBord and John P. Gonsoulin of Kirkland & Ellis L.L.P. of Washington, D.C.; John B. Isbister, Daniel S. Katz and Richard D. Rosenthal of Tydings & Rosenberg L.L.P. of Baltimore, MD), all on brief, for appellants.

Stephen Vaughan, Esq., Schmeltzer, Aptaker & Shepard, P.C., Washington, D.C.; Cindy Cohn, Esq., San Francisco, CA, for Consent Motion for leave to file a brief for amicus curiae by the Electronic Frontier Foundation, Common Cause, People for the American Way Foundation, Center for Constitutional Rights, America's Families United, Verified Voting Foundation and Votersunite! in Support of Plaintiffs' Appeal of Denial of Motion for Preliminary Injunction, for Appellants.

Michael D. Berman, Deputy Chief Civil Litigation (J. Joseph Curran, Jr., Attorney General of Maryland, and Judith A. Armold, Assistant Attorney General, Daniel F. Goldstein (Shelly Marie Martin of Brown, Goldstein & Levy L.L.P., Baltimore, MD)), on brief for Appellees.

Argued before BELL, C.J., and RAKER, WILNER*, CATHELL*, HARRELL, BATTAGLIA and GREENE, JJ.

———

* Wilner and Cathell, JJ., now retired, participated in the hearing and conference of this case while active members of this Court; after being

**BELL, C.J.**

The instant matter finds its genesis in a challenge brought by several registered Maryland voters and candidates for public office, collectively, "the appellants," to the decision of the Maryland State Board of Elections ("the State Board"), one of the appellees,[1] to purchase and certify, pursuant to Maryland Code (2003) §§ 9–101[2] and 9–102[3] of the Election

---

recalled pursuant to the Constitution, Article IV, Section 3A, they also participated in the decision and adoption of this opinion.

1. The other appellee in this matter is Linda H. Lamone, State Administrator of Elections in Maryland.

2. Maryland Code (2003) § 9–101 of the Election Law Article provides:
 "(a) *In general.—The State Board, in consultation with the local boards, shall select and certify a voting system for voting in polling places and a voting system for absentee voting.*
 "(b) *Use in all counties.*—The voting system selected and certified for voting in polling places and the voting system selected and certified for absentee voting *shall be used in all counties.*
 "(c) *Acquisition.*—The State Board shall acquire:
 "(1) the voting system selected and certified for voting in polling places; and
 "(2) the voting system selected and certified for absentee voting."
 (Emphasis added).
 Although this Article has been revised with a cumulative supplement through 2006, unless otherwise stated, all statutory references are to the Election Law Article of Maryland Code (2003), the statute in effect when this case arose.

3. Maryland Code (2003) § 9–102 of the Election Law Article provides:
 "(a) *Adoption of regulations.*—The State Board shall adopt regulations for the review, certification, and decertification of voting systems.
 "(b) *Periodic review.*—The State Board shall periodically review and evaluate alternative voting systems.
 "(c) *Standards for certification.—The State Board may not certify a voting system unless the State Board determines that:*
 "(1) *the voting system will:*
 "(i) *protect the secrecy of the ballot;*
 "(ii) *protect the security of the voting process;*
 "(iii) *count and record all votes accurately;*
 "(iv) *accommodate any ballot used under this article;*
 "(v) *protect all other rights of voters and candidates; and*
 "(vi) *be capable of creating a paper record of all votes cast in order that an audit trail is available in the event of a recount;*
 "(2) the voting system has been:

"(i) examined by an independent testing laboratory that is approved by the National Association of State Election Directors; and

"(ii) shown by the testing laboratory to meet the performance and test standards for electronic voting systems established by the Federal Election Commission; and

"(3) the public interest will be served by the certification of the voting system.

"(d) *Considerations for certification.*—In determining whether a voting system meets the required standards, the State Board shall consider:

"(1) the commercial availability of the system and its replacement parts and components;

"(2) the availability of continuing service for the system;

"(3) the cost of implementing the system;

"(4) the efficiency of the system;

"(5) the likelihood that the system will malfunction;

"(6) the system's ease of understanding for the voter;

"(7) the convenience of voting afforded by the system;

"(8) the timeliness of the tabulation and reporting of election returns;

"(9) the potential for an alternative means of verifying the tabulation;

"(10) accessibility for all voters with disabilities recognized by the Americans with Disabilities Act; and

"(11) any other factor that the State Board considers relevant.

"(e) *Regulations for each voting system.*—(1) The State Board shall adopt regulations relating to requirements for each voting system selected and certified under § 9–101 of this subtitle.

"(2) The regulations shall specify the procedures necessary to assure that the standards of this title are maintained, including:

"(i) a description of the voting system;

"(ii) a public information program by the local board, at the time of introduction of a new voting system, to be directed to all voters, candidates, campaign groups, schools, and news media in the county;

"(iii) local election officials' responsibility for management of the system;

"(iv) the actions required to assure the security of the voting system;

"(v) the supplies and equipment required;

"(vi) the storage, delivery, and return of the supplies and equipment necessary for the operation of the voting system;

"(vii) standards for training election officials in the operation and use of the voting system;

"(viii) before each election and for all ballot styles to be used, testing by the members of the local board to ensure the accuracy of tallying, tabulation, and reporting of the vote, and observing of that testing by representatives of political parties and of candidates who are not affiliated with political parties;

"(ix) the number of voting stations or voting booths required in each polling place, in relation to the number of registered voters assigned to the polling place;

"(x) the practices and procedures in each polling place appropriate to the operation of the voting system;

"(xi) assuring ballot accountability in systems using a document ballot;

Law Article ("EL"), the Diebold AccuVote–TS ("Diebold") direct recording electronic ("DRE") voting system for use in the November 2, 2004 elections. Specifically, the appellants, plaintiffs below, citing vulnerabilities in the system's security and accuracy, sought injunctive relief in the form of the decertification[4] of the DRE voting machines, or, in the alternative, the addition of a voter-verified paper audit trail of all ballots cast, which would permit an independent audit of the machines. The question presented on this appeal is whether the Circuit Court for Anne Arundel County erred in finding that the State Board acted reasonably in purchasing and certifying the Diebold voting system, thus denying the appellants' request for a preliminary injunction. In addressing this issue we consider whether the Circuit Court applied the correct standard in assessing the security and accuracy of Maryland's voting system and whether it properly exercised sound discretion in examining the factors necessary to support a preliminary injunction.

## I.

Electronic voting machines have been used in Maryland since 1996, when Baltimore City became the first jurisdiction to procure and deploy a DRE voting system.[5] Precipitated in

---

"(xii) the actions required to tabulate votes; and

"(xiii) postelection review and audit of the system's output.

"(3) Certification of a voting system is not effective until the regulations applicable to the voting system have been adopted."

(Emphasis added).

**4.** *See* Maryland Code (2003) § 9–103of the Election Law Article, which provides:

"(a) *Decertification—In general.*—The State Board:

"(1) may decertify a voting system previously certified if the State Board determines that the system no longer merits certification; and

"(2) shall decertify a previously certified voting system if the voting system no longer meets one or more of the standards in § 9–102(c)(1)(i) through (iii) of this subtitle.

"(b) *Time and conditions of decertification.*—The State Board shall determine the effective date and conditions of the decertification."

**5.** The Baltimore City system, the AVC Advantage DRE voting system, is not involved in this lawsuit.

part by the 1994 Gubernatorial Election, in which, in a very close election for governor, there had been problems with vote counting accuracy and conducting recounts, Maryland began looking for ways to improve its voting process. As part of the State's election reform, a series of commissions were appointed to study the elections process in Maryland. As a result of that examination, it was suggested that elections in Maryland needed to be modernized and that uniformity should be the benchmark for any such efforts. In addition, a revision to the then antiquated election code was recommended.

In response, the General Assembly mandated the "maximiz[ation of] the use of technology in election administration, including the development of a plan for a comprehensive computerized elections management system[,]" EL § 2–102(b)(7),[6] and, on December 4, 2000, Governor Glendening, pursuant to Executive Order 01.01.2000.25, formed a Special Committee on Voting Systems and Election Procedures in Maryland ("the Special Committee"). The Special Committee issued a report in February 2001, recommending that Maryland adopt, in an attempt to eliminate a myriad of administrative problems which existed as a result of the differing systems that were being used at the time by the various counties around the State, a uniform statewide voting system for both the polling places and for absentee voting. It preferred, citing their reliability, accuracy and security, a DRE voting system for all polling places and an optical scan voting system for absentee ballots.

The Special Committee indicated that there were several advantages to a DRE system, including, *inter alia*, the machines are programmed to prevent overvotes, reduced cost, no questionable marks resulting in the need to guess at voter intent during a recount, no need for the printing of paper

_____

6. The current iteration of EL § 2–102, transferred to Maryland Code (1957, 2003 Repl.Vol.) by Chapter 291, Laws of Maryland 2002, was added to the Election Code, as part of its "General Revision" to "mak[e] substantive, technical and stylistic changes to the . . . Code[,]" as Maryland Code (1957, 1997 Repl.Vol.), Article 33, § 2–102 by Chapter 585, Laws of Maryland 1998, effective January 1, 1999.

ballots, the blind and visually impaired voters would be able to cast their votes without assistance, and ballots can be programmed in multiple languages. The Special Committee also noted the potential difficulties with the implementation of a DRE system: compared to optical scan systems, such a system may cost more for some local jurisdictions because of the sophisticated technology and the need for multiple units per precinct, rigorous, comprehensive testing would have to be performed in order to insure the accuracy and security of the system's software, and additional personnel would have to be hired or available to the State and Local Boards of Elections. Some specific recommendations of the Special Committee included that the system:

"Provide the voter the highest degree of secrecy as practicable when casting his or her vote[;]"

"Be capable of creating a paper record of all votes in order that an audit trial [sic][be] available in the event of a recount[;]"

"Allow, during the pre-election testing of voting systems, a random number of ballots or votes to be tested to ensure accurate tabulation[;]" and

"Be available for leasing rather than purchasing in order to take advantage of anticipated technological advances...."

The Maryland General Assembly adopted some of the Special Committee's most significant recommendations at its 2001 session, enacting Chapter 564, Laws of Maryland 2001, which added portions of the language now embodied in EL, Title 9, Subtitle 1.[7] That enactment required that the uniform statewide voting system be fully implemented by July 1, 2006.[8]

---

7. *See, e.g.,* EL § 9–101(b), providing for a uniform statewide system of voting; EL § 9–101(c), providing for separate voting systems in polling places and for absentee voting; and EL § 9–102(c)(vi), providing for the creation of "a paper record of all votes cast in order that an audit trail is available in the event of a recount[.]"

8. *See* Chapter 564, § 5, Laws of Maryland 2001, which, taking into consideration Baltimore City's purchase of the AVC Advantage DRE

Adhering to the directives of the General Assembly, the State Board issued a Request for Proposals to purchase DRE voting machines for use in all Maryland polling places. The State Board also hired an evaluation agent with expertise in voting systems and created an ad hoc committee, the Election System Evaluation Committee ("ESEV"), to assist in examining the proposals and ultimately with the selection of a vendor. At the conclusion of its investigations, after meeting with various vendors and evaluating the DRE voting machines, the ESEV declined to endorse any of the vendors and recommended that the State invoke its right to reject all proposals and not move forward with the purchase of electronic voting machines altogether.

Ultimately, the State Board purchased the Diebold system for use in Maryland polling places. The voting system was to be implemented in three phases: Phase I included deployment of the DRE machines in four counties—Allegany, Dorchester, Montgomery, and Prince George's—for the 2002 elections; Phase II included implementation in 17 (eventually 19) counties for the 2004 elections;[9] and Baltimore City was to receive the system in 2006 as part of Phase III. The Diebold machines were used successfully in the four "Phase I" counties during

---

voting system for use in the 1996 elections, as well as Caroline and Cecil County's purchase of new systems at the time, provided:
"SECTION 5. AND BE IT FURTHER ENACTED, That:
"(a) A county that has purchased a voting system for voting at polling places within the last 10 years and before December 31, 2000 is not required to implement the uniform statewide voting system for voting at polling places provided for under this Act until July 1, 2006, and is not required to pay a share of the cost of acquiring and operating the uniform statewide system for voting at polling places until the system is implemented in the county; and
"(b) A county that has purchased a voting system for absentee voting within the last 10 years and before December 31, 2000 is not required to implement the uniform statewide voting system for absentee voting provided for under this Act until July 1, 2006, and is not required to pay a share of the cost of acquiring and operating the uniform statewide system for absentee voting until the system is implemented in the county."

9. Originally, Caroline and Cecil Counties were scheduled to implement the system in 2006, but requested that the machines be installed earlier.

the 2002 elections,[10] thus confirming for the State Board that it should continue with Phase II of the system's implementation. Therefore, the State Board purchased Diebold machines for the remainder of the counties, other than Baltimore City, for the 2004 March Primary Election. This decision by the State Board was not without a great deal of controversy.

The first criticism of the State Board's actions was contained in a report, entitled "Analysis of an Electronic Voting System" ("the Hopkins Report"), published by Dr. Aviel Rubin, a professor at Johns Hopkins University, and his colleagues. Claiming to have reviewed the source code used in the Diebold machines, the Hopkins Report questioned the security of the newly acquired machines, identifying several *theoretical*[11] problems in the source code that could permit someone to alter the election results. The report also emphasized the need for a voter-verified audit trail in order to secure the integrity of the entire election process.

In response to the Hopkins Report, attempting to assess whether the theories proposed by Dr. Rubin were valid, Governor Ehrlich ordered an independent risk assessment of the Diebold machines. Accordingly, the Department of Budget and Management engaged Science Applications International Corporation ("SAIC"), an independent consultant, to examine the Diebold machines as implemented, at the conclusion of which SAIC released a report. While on the one hand criticizing Dr. Rubin, claiming that he did not have a complete

---

**10.** Although there was no evidence that the Diebold machines were tampered with, hacked into, or manipulated to affect the results of the 2002 elections, the State Board did have some complaints as to the quality and number of personnel assigned by Diebold to assist Maryland in implementing the system, and security concerns began to emerge when the source code for the DRE machines was discovered on the Internet and widely distributed.

**11.** One such theory proposed by Dr. Rubin was that persons could breach the system by conceivably manufacturing their own voting cards, which would allow them to vote multiple times. Dr. Rubin later abandoned this notion after serving as an election judge for Baltimore County, admitting that the scenario would not be plausible in an actual election.

understanding of the system, including the procedural controls and general voting environment, SAIC's report also identified a series of vulnerabilities in Maryland's voting system and elections process as a whole, noting several areas in which improvements could be made. The report went on to make recommendations for the mitigation of these vulnerabilities. Taking into consideration SAIC's report, the State Board crafted a "Voting System Security Action Plan," specifying the steps it would take to improve the security of elections in Maryland.

Subsequently, the Department of Legislative Services, in an attempt to conduct its own analysis of the security issues raised by the Hopkins and SAIC reports concerning the Diebold system, hired RABA Technologies, LLC ("RABA"), an Information Technology security consulting firm. The RABA group was led by Dr. Michael A. Wertheimer, a National Security Agency security expert, specializing in cryptologic mathematics. The RABA report criticized both Dr. Rubin's and SAIC's report, and it identified additional vulnerabilities in the voting system. Moreover, similar to the earlier reports, the RABA report made recommendations for changes and improvements to both the voting system, as well as Maryland's elections process.

The State Board evaluated the RABA report and adopted several, but not all, of the recommended security measures in time for the 2004 primary election. Further security enhancements were also made after that year's primary election.[12] Although it did not implement all of RABA's recommenda-

---

**12.** Among the many recommendations adopted by the State Board were: the hiring of a chief information security officer and other staff members to supplement its existing technical and security staff; the hiring of an outside computer security consulting company to review all of the reports and work with the State Board to improve the voting system; the addition of encrypted passwords for supervisor smart cards; the addition of an authentication procedure for transmitting preliminary results via modem; the parallel monitoring of random voting machines; the updating of anti-virus software; and the provision of security training for all persons involved in the election, from members of the State Board to local election judges.

tions, the State Board examined each recommendation fully and produced two written reports of its own: "Response to: Department of Legislative Services Trusted Agent Report on Diebold AccuVote–TS Voting Systems" and "Progress Report: Department of Legislative Services Trusted Agent Report on Diebold AccuVote–TS Voting Systems." In these reports, the State Board offered an explanation as to why recommendations were not adopted.[13] The use of the Diebold machines during the 2004 March primaries, in the additional 19 counties, brought the State Board one step closer to executing Phase II of its implementation plan.

## II.

On April 21, 2004, still sensitive to the concern held by many that the Diebold machines were still not secure and would not protect the integrity of the voting process for the approaching November 2004 elections, a group of registered Maryland voters and candidates for public office [14] sought expedited judicial relief in the Circuit Court for Anne Arundel County, pursuant to EL §§ 12–202 [15] and

---

**13.** One such instance involved RABA's recommendation that the State Board install Microsoft security patches on the machines to tabulate official election results. The State Board and its security contractor decided against such installation, noting that the patches may in fact interfere with the system and cause it to crash. Instead, the State Board took measures to protect the machines by physically securing and password protecting the servers, and safeguarding all input devices, such as disk drives, with tamper tape.

**14.** There was some contention, raised below by the appellees, defendants below, as well as in this Court on appeal, as to whether the registered voters identified in the Complaint, and later the Amended and Verified Complaint, had standing to bring the action. None of the appellants testified at trial and, therefore, there was no evidence with respect to the nature of the harm they suffered. The trial court rejected the argument. When, during oral argument in this Court, the issue was raised again, the appellees did not object to the standing of the appellants as there was no evidence contrary to that which was pled in the complaints. Accordingly, we do not address the issue.

**15.** Maryland Code (2003) § 12–202 of the Election Law Article provides:

**14**

12-203,[16] of the State Board's decision to purchase and certify the Diebold voting machine. The appellants, plaintiffs below, later filed an Amended Complaint and Verified Complaint on May 13, 2004. Specifically, the appellants requested the entry of a permanent injunction requiring the State Board to decertify all Diebold voting machines "until such time as they can be updated to comply with the strictures of Maryland law that safeguard the security and integrity of Maryland's voting systems."[17] If upgrades to the voting system could not be

"(a) *In general.*—If no other timely and adequate remedy is provided by this article, *a registered voter may seek judicial relief from any act or omission relating to an election,* whether or not the election has been held, on the grounds that the act or omission:
"(1) is inconsistent with this article or other law applicable to the elections process; and
"(2) may change or has changed the outcome of the election.
"(b) *Place and time of filing.*—A registered voter may seek judicial relief under this section in the appropriate circuit court within the earlier of:
"(1) 10 days after the act or omission or the date the act or omission became known to the petitioner; or
"(2) 7 days after the election results are certified, unless the election was a gubernatorial primary or special primary election, in which case 3 days after the election results are certified."
(Emphasis added).

16. Maryland Code (2003) § 12–203 of the Election Law Article provides:
"(a) *In general.*—A proceeding under this subtitle shall be conducted in accordance with the Maryland Rules, except that:
"(1) *the proceeding shall be heard and decided without a jury and as expeditiously as the circumstances require;*
"(2) on the request of a party or sua sponte, the chief administrative judge of the circuit court may assign the case to a three-judge panel of circuit court judges; and
"(3) an appeal shall be taken directly to the Court of Appeals within 5 days of the date of the decision of the circuit court."
"(b) *Expedited appeal.*—The Court of Appeals shall give priority to hear and decide an appeal brought under subsection (a)(3) of this section as expeditiously as the circumstances require."
(Emphasis added).
The appellants initially requested, pursuant to EL § 12–203(a)(2), a three judge panel of circuit court judges to hear the case; however, they withdrew that request.

17. The "updates" proposed by the appellants, all of which, according to the appellants, "should be confirmed by independent experts," included

implemented before the November elections, the appellants proposed that the State Board revert to the pre-existing optical scan system that had been previously used throughout the State.

One day prior, on May 12, 2004, the National Federation for the Blind ("NFB") filed, pursuant to Maryland Rule 2–214,[18] a Motion to Intervene in the action. Having recently brought suit against the State in federal court on behalf of blind voters so that they could vote independently and privately, the NFB sought to uphold the use of the Diebold machines. The State Board and the NFB, both moved to dismiss the appellants' verified complaint, filing motions on May 21, 2004 and May 26, 2004, respectively. In addition, on May 27, 2004, the State Board filed a Motion for a Protective Order. By that motion, claiming that the "[p]laintiffs' proposed discovery is intrusive and burdensome," and that the "Court should exercise its discretion to prevent the plaintiffs from diverting election officials from their important governmental tasks, unless it

---

"without limitation the full implementation of the procedural safeguards identified in the RABA report …, the institution of a voter-verified paper audit trail, and such other measures as prove necessary to ensure the security, reliability, and accessibility of the new machines."

**18.** Maryland Rule 2–214 (2003) provides, in relevant part:
"(a) *Of Right.* Upon timely motion, a person shall be permitted to intervene in an action: (1) when the person has an unconditional right to intervene as a matter of law; or (2) when the person claims an interest relating to the property or transaction that is the subject of the action, and the person is so situated that the disposition of the action may as a practical matter impair or impede the ability to protect that interest unless it is adequately represented by existing parties.
"(b) *Permissive.* (1) Generally. Upon timely motion a person may be permitted to intervene in an action when the person's claim or defense has a question of law or fact in common with the action.
\* \* \*
"(c) *Procedure.* A person desiring to intervene shall file and serve a motion to intervene. The motion shall state the grounds therefor and shall be accompanied by a copy of the proposed pleading setting forth the claim or defense for which intervention is sought. An order granting intervention shall designate the intervenor as a plaintiff or a defendant. Thereupon, the intervenor shall promptly file the pleading and serve it upon all parties."

holds that a claim has been stated," it sought to preclude all discovery in the case until there had been a ruling on its Motion to Dismiss.[19] Rather than rule on the protective order motion, the Circuit Court ordered a scheduling conference for June 28, 2004 to "discuss the discovery problems, the Motion to Dismiss, and an orderly, but expeditiously set scheduling procedure for all to follow."

Before the scheduling conference, however, on June 25, 2004, the appellants filed a Motion for Preliminary Injunction "to maintain the status quo and enjoin [the] Defendants from using the Diebold ... voting system in the November 2004 elections [,]" claiming that the remedy they sought was "in danger of being extinguished not by a ruling [on] the merits but by the passage of time." They claimed further that the State Board "recklessly certif[ied] the Diebold ... voting system," and that it did not "fix or decertify the machines once numerous reports commissioned by the state of Maryland ... confirmed that the machines could not preserve the security and reliability of Maryland elections." Both the State Board and the NFB filed oppositions to the appellants' request for injunctive relief.

At the scheduling conference, the court ordered discovery stayed until there was a ruling on the State Board's and the NFB's motions to dismiss, the hearing for which had been set for July 22, 2004. In addition, the court set the matter for a three-day evidentiary hearing, from August 25–27, regarding the appellants' motion for injunctive relief. At the July 22,

---

**19.** The motion was undoubtedly in response to service of a Request for Production of Documents upon the State Board and Notice of Deposition and Subpoena upon Diebold Election Systems, Inc. Subsequently, the appellants filed, on June 4, 2004, a Notice of Deposition of a State Board representative and, on June 18, 2004, served on the State Board their First Set of Interrogatories and First Requests for Admissions. In response to the appellants' additional discovery requests, the State Board filed two supplements to its May 27, 2004 protective order motion. The NFB also filed a Motion for Protective Order on June 11, 2004, objecting to the appellants' request of documents from Diebold, Inc. involving the corporation's relationship with the NFB on the basis that information sought by the appellants was "constitutionally protected and irrelevant to th[e] case."

2004 hearing, the court held both motions to dismiss *sub curia.*

At the evidentiary hearing, the Circuit Court heard testimony from a number of witnesses. The appellants offered the testimony of three experts, one State Board official and two non-party lay witnesses, while the State Board called one expert and several State Board officials, and the NFB called one NFB official.[20] Conceding that decertification of the Diebold voting machines was no longer feasible, the appellants made three arguments. First, they alleged that the Diebold DRE voting system, as theretofore implemented, did not protect the security of Maryland's voting process and did not count votes accurately. At the crux of the appellants' argument were the numerous vulnerabilities in the machines. The appellants offered expert testimony that underscored these vulnerabilities in addition to testimony detailing some of the specific problems encountered during the March primaries.[21] The appellants, moreover, maintained that the State Board

---

**20.** In addition, the *de bene esse* deposition, in videotape form, of Denise Lamb, the Director of the New Mexico Bureau of Elections, was presented by the NFB.

**21.** As to the specific election day malfunctions that occurred, the appellants offered the testimony of Mary von Euler, the democratic chief election judge in Montgomery County and Mr. Jeffrey Liss, a registered voter and attorney. Ms. von Euler testified that, as an election judge, she received several complaints from voters concerning the malfunction of machines, *i.e.* one screen appeared horizontally in a landscape format, while another repeatedly highlighted the name of a candidate that did not correspond with the voter's actual selection before finally highlighting the correct selection. In both cases the machines were shut down for the remainder of the election. In addition, Ms. von Euler testified that the visual equipment on the machines could not be tested and the votes could not be cumulated at the end of the day.

Mr. Liss' testimony recounted his personal experience with the Diebold machines on election day. To begin, Mr. Liss, after repeatedly pressing the "review ballot" option on the Diebold screen, was unable to review his ballot before actually casting it. He also claimed that he was not presented a "complete" ballot. According to Mr. Liss, the ballot that he filled out did not include all of the races. Mr. Liss was later allowed to complete a provisional ballot to ensure that he voted in all the races.

failed to respond adequately to the security and accuracy concerns related to the system.

The appellants' next argument pertained to the system's lack of capacity to provide an audit independent of the already existing security and accuracy concerns of the system itself. They claimed that without a voter-verified audit trail, the State, in the event of a recount, would only have the same inaccurate system which may have called into question the results of the election in the first place to rely upon.[22] Thus, the results, the appellants maintained, would never be completely accurate and, in any event, would not inspire confidence in their accuracy.

Finally, the appellants asserted that the remedies sought at trial, i.e. parallel monitoring of machines, poll worker training, a paper ballot option for voters, and complete implementation of the RABA recommendations, would minimize the security and accuracy failings of the machines, were feasible and could be put into place prior to the November election, and would not significantly disrupt the election process. The appellants maintained, in addition, however, that whatever the results of the November election, whether some or all of the system's deficiencies were cured, the lack of public trust in the system itself, due to the many public reports criticizing it, undermined the integrity of the election and its results.

Drs. Rubin and Wertheimer, defending their reports, were the appellants' expert witnesses.[23] The cornerstone of Dr.

---

22. The State Board's audit system at the time depended on printing out ballot images that were stored in the voting machines themselves after the election. Therefore, in the appellants' view, the ballot image technology was subject to the same vulnerabilities as the machines which used it, with the result that the election results of this non-voter verified system could not be properly authenticated.

23. The appellants also called Dr. Kimball Brace as an expert on election administration. The motion to qualify Dr. Brace, however, was opposed. After a lengthy *voir dire* examination, the court qualified Dr. Brace as an expert, stating: "I'm going to do this. I'm going to allow the gentleman to testify as an expert. What weight I give to

Rubin's opinion, applying a "perfection" standard, was that it is impossible for a paperless electronic voting machine to protect the security and accuracy of the voting process. As a solution, he proposed a voter-verified audit trail.[24] Dr. Rubin further testified that, in July 2003, approximately 13 months prior to the hearing in the Circuit Court, he had examined an older version of the source code found in the Diebold machines and that the system was inherently susceptible to security vulnerabilities, which could potentially result in an undetected alteration of election results. It was stipulated, however, that he did not know whether the source code that he had previously examined was the same version of the source code that was presently in the machines and that would be used during the November elections. In addition, Dr. Rubin testified that he was not aware of the changes made by the State Board since the date of his study and whether those changes improved the security of the voting system overall.[25] He testified further that he was unaware of the security standard imposed by Maryland law pertaining to voting systems, and that he had solely focused on the security of the system's software and did not take into consideration any other equally

experts in any of these cases is solely at my discretion, so feel free to question him."

Dr. Brace was not very familiar with Maryland's voting system, and, while advocating for the paper ballot option, he had no substantive recommendations as to its implementation. The State Board, through the testimony of Mr. Joseph Torre, its operations officer for voting system procurement, estimated that a paper ballot option, which would include, *inter alia*, the cost of printing the ballots and purchasing secrecy sleeves, ballot boxes and privacy booths, would cost approximately $6 million dollars. Extensive voter education and training on how to fill out such ballots would also have to be conducted and additional election judges would have been required, he opined.

24. The appellants admitted at the evidentiary hearing that a voter-verified audit trail, like the decertification of the machines themselves, was no longer a feasible remedy, as it would have been impossible to have implemented such a system before the November election.

25. At trial, it was revealed that Dr. Rubin was unaware of the State Board's published responses to not only his report, but also to the SAIC and RABA reports, and he had, thus, not reviewed them.

important factors of the election process. Finally, Dr. Rubin admitted that many of his initial assumptions about the Diebold machines were incorrect and unrealistic.

Dr. Wertheimer testified at length with respect to the evaluation that he and his team, collectively, "the RABA team," conducted on the Diebold voting system. The RABA team, unlike Dr. Rubin, did not focus only on a single element of the system, i.e. the software; instead, it focused on the technical, operational and procedural components of the system, applying a "military" standard to the system's review. As explained by Dr. Wertheimer:

> "In my view, I think voting is a fundamental infrastructure for this country. That's the attitude I brought to this analysis. I think it's as important as a software that controls flight traffic. I think it's as important as our banking system, things I've had to defend. . . . I prefer to apply a model, in my opinion as an intelligence official, that if you're going to protect this at the level we protect other critical infrastructure, the model has to be that what is your adversary, how much is he willing to spend to throw an election. And we applied that methodology. As a result of that, we made a number of recommendations and graded the system quite low."

Dr. Wertheimer went on to recognize that the level of security imposed when evaluating any system is a policy choice and that he, like Dr. Rubin, did not know if the standard he applied in his analysis was the same as that imposed by Maryland law. Dr. Wertheimer acknowledged that there is no uniform standard applied to the evaluation of Maryland's, or any, voting system and that "reasonable people can have differences of opinion on virtually any aspect of the electronic voting machine debate." Finally, Dr. Wertheimer, while noting that the Diebold machines did not pass the RABA team's rigorous attack, testified that he was not sure as to how many hackers would be deterred by implementing the RABA recommendations.

The State Board and the NFB advanced various arguments in response. To begin, the State Board pointed out that the appellants were not, in fact, seeking to maintain the status quo with their preliminary injunction motion, for the status quo in Maryland was, after the March primaries, the use of the Diebold DRE machines. With the deployment of the machines statewide in the primary election, the State Board argued that the status quo could not be maintained with the addition of any other system. Specifically, it posited that the introduction of a paper ballot option, or any other voter choice, would violate the "uniform" system requirement of EL § 9–101(b). The State Board asseverated that giving voters a choice of systems would destroy uniformity and establish a bad precedent. Moreover, such a choice was, the State Board insisted, impractical and impossible to administer at such a late date.

The State Board argued further that the certification of a voting system in the State is delegated, by the General Assembly, to the Board itself. According to the State Board, the question before the trial court was not whether it had acted correctly, but, instead, whether it had acted arbitrarily or capriciously. The State Board maintained that its decision to purchase and certify the Diebold machines was reasonable and that, once concerns were raised about the security of the machines, it evaluated and thoughtfully responded to each recommendation. In the State Board's view, no further action was needed.

The NFB's main argument, not surprisingly, related to accessibility. The NFB noted that, for the first time, blind voters were able to vote independently and secretly. It noted further that many of the interim remedies proposed by the appellants did not involve issues of accessibility, other than the paper ballot option which, the NFB pointed out, in fact, would be a matter of inaccessibility for blind voters, as their votes would, as a result, be private no longer. In addition, the NFB questioned whether a paper option would satisfy the statutory requirements, outlined in EL § 9–102, that the appellants alleged the DRE machines did not satisfy. Expounding upon

some of the many vulnerabilities of a paper ballot option, i.e. residual votes, under-voting, over-voting, stray marks, ballot box stuffing, the NFB contended that the appellants could not prove that such an option would be any more secure than electronic voting; thus, it urged, the court could, and should, not compel the State Board to adopt it.

The witnesses for the defense, many of whom were, as mentioned earlier, State Board officials, maintained that the State Board would be able to conduct a secure and accurate election in November with the use of Diebold DRE machines. According to their testimony, many of the preliminary criticisms of the machines were largely hypothetical and inconsistent. Additionally, they described, in detail, the corrective measures that the State Board had taken to correct some of the valid security concerns that affected the system. The defense witnesses concluded that the greatest threat to the security and accuracy of the election was not the DRE machines, but an eleventh hour challenge, such as the one brought by the appellants.

The defense called one expert witness, Dr. Michael Shamos.[26] Dr. Shamos testified that he had reviewed all of the reports on the Diebold voting machines, as well as the State Board's responses. He had also reviewed the applicable Maryland law. From his extensive research, Dr. Shamos concluded that Maryland would be able to provide a secure November election using Diebold machines. According to Dr. Shamos, there does not exist a voting system that is impervious to fraud, a notion he believes should be reflected in the standard applied when evaluating such systems. Applying a "reasonableness" standard, he explained:

"[T]he standard of security is not 100 percent inviolability, or 100 percent safety against any conceivable risk that

---

**26.** Dr. Shamos was qualified as an expert in the history of voting in the United States, operation of voting systems, certifications of voting systems, computer systems, and computer security. Although the appellants had no objection to his expertise in the other areas, they did oppose Dr. Shamos' qualification as an expert on computer security. That challenge was unsuccessful, however.

somebody may dream up. It is a balancing of the kinds of activities that occur in polling places, the kinds of activities that hackers attempt to perform versus the realism and expense of adopting counter measures. And when that balancing is done, the Board, or whatever state or whatever authority it is that is empowered to make that decision does that balancing and decides some systems are safe and some systems aren't[.]"

As a certifier of electronic machines himself, Dr. Shamos went on to admit that he would "never say [a system is] 100 percent secure because [he] would be lying."

Dr. Shamos' testimony also directly refuted some of the opinions offered by Drs. Rubin and Wertheimer.[27] More specifically, Dr. Shamos disagreed with Dr. Rubin's view that a voter-verified paper audit trail is necessary. According to Dr. Shamos, no commercial system provides for a voter-verified paper audit trail, and even if there were such a system, it would do no more than provide partial assurance to the voter that his or her vote has been accurately counted. As Dr. Shamos explained, such a paper trail "does not solve the problems that are alleged to affect or afflict DRE machines." Moreover, Dr. Shamos noted that a paper audit trail would "simply restore[ ] us to the 1850's when all manner of chicanery was performed through manipulation of pieces of paper. And we don't have any better technology now than we had 150 years ago for assuring the security of pieces of paper." It was Dr. Shamos' testimony that paper-based ballot options, *i.e.* paper ballots and optical scan systems,[28] were less, not more, secure than DRE machines, and that paper ballots and optical

---

27. Dr. Shamos squarely disagreed with Dr. Wertheimer's claim that Microsoft patches needed to be placed on the machines. He testified that, after determining that the disadvantages of installing the patches outweighed the potential advantages, the State Board's decision to not incorporate that RABA recommendation was reasonable. See note 13, at 10–11 *supra.*

28. Dr. Shamos made note that optical scan systems are not, and have never been, subjected to the exhaustive testing that has been performed on DRE machines.

scan systems were not remedies, but instead alternatives, at best, to the alleged vulnerabilities in DRE machines.

In a written opinion, the Circuit Court denied the appellants' request for injunctive relief. The trial court rejected the appellants' arguments, finding, instead, that Dr. Shamos presented "the true voice of reason" and was "the most credible expert in th[e] matter." The Circuit Court enunciated:

"While the Court is extremely concerned with the allegations of vulnerabilities and security flaws in th[e Diebold] system, as well as any other system, the credible testimony by Dr. Shamos indicated the State of Maryland is now employing all reasonable solutions and fixes suggested by all experts and has developed a system that could and should withstand external attack."

Adopting Dr. Shamos' "more appropriate standard of care," the Circuit Court went on to consider and evaluate the pertinent factors for injunctive relief. The court was not convinced that the appellants had established a real probability of prevailing on the merits and remarked that the harm that the State would suffer if it had to implement a very costly paper option for the "small number of plaintiffs" who wished to have that option far outweighed the risk of those plaintiffs' votes not being counted due to some breach in the DRE machines. In other words, the hypothetical harm proposed by the appellants, in the trial court's opinion, did not outweigh the real harm that the appellees would suffer were it to rule otherwise.

In addition, the Circuit Court found that the DRE machines "clearly protected" "the secrecy of the ballot" for visually impaired voters. The implementation of DRE machines, the court reasoned, allowed "blind voter[s], for the first time, [to] vote without the need of another looking over their shoulder and guiding them through the process." The Circuit Court also questioned the imminency of the appellants' harm. It noted, in that regard, although not finding the action barred by laches, that the appellants "had ample notice, as early as 2002, of the use of the Diebold machines and clearly could

have taken steps earlier than late April 2004 concerning the November 2004 presidential election."

Although the Circuit Court acknowledged that there was a possibility that some votes may not be counted, it was confident that, due to the State Board's implementation of "the more reasonable requests and recommendations made by all the studies," the many "doomsday-type scenarios" advanced by the appellants would not occur, in fact. Accordingly, it determined that they could not cause the appellants irreparable harm. According to the court, "the overwhelming factual evidence clearly shows there have been no verified incidences of tampering with these machines anywhere in the United States. The votes have been counted accurately. Recounts have occurred with complete accuracy, and there is no reason to believe this will not continue."

Finally, the Circuit Court found that the interests of the public were being served and protected "by the careful and complete review by the State Board of Elections of all reports, independent testing, and the eventual implementation of those factors deemed appropriate to be instituted for the protection of the public and the voting system." Granting the appellants' injunctive relief so close to the election would, the court reasoned, only cause voter confusion.

In response to the Circuit Court's ruling, the appellants noted an appeal to this Court [29] and filed a Petition for Writ of Certiorari, which this Court granted. *Schade v. Maryland State Bd. of Elections*, 383 Md. 211, 857 A.2d 1129 (2004). Oral argument was heard on September 14, 2004, and, on that same day, the Court issued its Order affirming the judgment of the Circuit Court. We now set forth the reasons for that Order.

## III.

Before this Court, the appellants argue that the Circuit Court both erroneously found that the State Board acted

---

**29.** *See* EL § 12–203, *supra* note 16, at 12.

reasonably in its purchase and certification of the Diebold voting system, and erroneously denied their request for injunctive relief.[30] Conceding, as they did below, that decertification of the DRE machines and the creation of a paper audit trail were no longer feasible remedies, on appeal, the appellants requested this Court to compel the State Board to implement certain security upgrades and measures to improve the security and reliability of the Diebold machines for the November 2004 election. Specifically, they sought the implementation of nine RABA recommendations,[31] the adoption of a series of federal best practices election guidelines,[32] and a

---

**30.** On brief, the appellants presented the following statements of questions:

"I. The Circuit Court applied an incorrect standard in assessing the security and accuracy of Maryland's electronic voting system.

"II. Even if § 9–102 and § 9–103 implicitly incorporates Dr. Shamos's 'reasonableness' standard, the record as a whole does not support the Circuit Court's findings."

**31.** The appellants specifically requested that the State Board:

"Install all known security patches from Microsoft on the GEMS server[;] "Establish a procedure to effectively evaluate security patches as soon as they are released[;]

"Turn off all services and ports except those explicitly required by the GEMS software;

"Install a software package called "Tripwire" onto the GEMS Servers[;]

"Place a printed image of the ballot next to every polling station[;]

"Implement a procedure to ensure that the software has not been modified during the election day[;]

"Increase election judge training[; and]

"Conduct independent evaluations of the source code when the source code is changed or upgraded."

During oral argument, as they did below, the State Board argued that the implementation of many of the RABA recommendations sought by the appellants had already occurred, while those that had not been implemented were considered and then reasonably rejected. Thus, the State Board proffered that the RABA recommendations, and the testimony of its author, Dr. Wertheimer, were stale. According to the State Board, the Diebold machines were not proven to be vulnerable as deployed and as updated since the various studies criticizing them were performed.

**32.** The appellants sought the adoption of the U.S. Election Assistance Commission's ("EAC") "Best Practices in Administration, Management and Security in Voting Systems and Provision Balloting." The publica-

paper ballot option for those voters who do not wish to use DRE machines. Conversely, finding no error in the Circuit Court's ruling, the appellees, defendants below, urged this Court to affirm the trial court's denial of injunctive relief.

## A.

At the core of the appellants' argument is that the Circuit Court applied an incorrect standard in assessing the security and accuracy of Maryland's electronic voting system. They allege that the Circuit Court, by adopting wholesale the testimony of defense witness Dr. Shamos, read into the applicable statutory requirements, *see* EL §§ 9–102 and 9–103, a "lesser" standard for the evaluation of the State Board's actions. This application of the statutory requirements by the Circuit Court, the appellants posit, "ignored the statutory purpose of protecting public confidence in the integrity of the election, discounted the importance of elections to our democratic system, disregarded the unique multitude of risks presented by electronic voting systems, and brushed aside the appropriate standard suggested by the security experts hired by the Maryland legislature," *i.e.* Dr. Wertheimer and the RABA team's higher, "military," standard.[33] It is the appellants' assertion that, "absent this clear legal error, the court below could not have reached its conclusion that [they] showed no likelihood of success on the merits."

The appellants insisted that "the circuit court's decision to settle with 'reasonable' security and 'reasonable' accuracy as opposed to the higher level of security applied to other critical systems that support our democracy is both inexplicable and legally incorrect" given the serious nature of the November 2004 election where there exists "the very real possibility that a small margin of votes will determine the results." Recogniz-

---

tion of the guidelines was in response to a mandate of the Help America Vote Act of 2002, 42 U.S.C. § 15301 *et seq.*

**33.** The appellants contend that Dr. Wertheimer did not in fact adopt a standard of "military impregnability," and, instead, refer to his standard as the "industry norm."

ing that the election at issue in the case *sub judice* was not an "ordinary" one, but instead a Presidential election, *see Bush v. Gore*, 531 U.S. 98, 112, 121 S.Ct. 525, 533, 148 L.Ed.2d 388 (2000), the appellants maintained that "the critical need to secure the integrity of the election process is further under-scored[.]"

Moreover, the appellants claimed that the Circuit Court's application of a "reasonableness" standard caused the court, in turn, to implement the incorrect standard to its review of the State Board's actions. According to the appellants, the State Board's duty to select and certify a voting system, as outlined by the election code, involves a legislative mandate as opposed to an agency decision warranting discretion, making it ministe-rial in nature. Thus, the appellants averred that the State Board is not entitled to the more deferential "arbitrary and capricious" standard imposed by the Circuit Court. Instead, the appellants posited that, by allowing for judicial review of the State Board's actions, *see* EL § 12–202, the Code ultimate-ly leaves the decision as to which voting system should be certified to this Court.

Disagreeing with the appellants' characterization of the State Board's role in the selection and certification of voting systems as ministerial, the appellees argued that the State Board, through the delegation of the General Assembly, see EL § § 9–101 through 9–103, was acting in a policy-making or quasi-legislative capacity. Citing *Fogle v. H & G Restaurant, Inc.*, 337 Md. 441, 458, 654 A.2d 449, 458 (1995), the appellees posited that the Circuit Court was bound to give deference to the State Board's decision. More specifically, the appellees, relying on *Proctor v. Brookhart*, 195 Md. 200, 204–05, 72 A.2d 682, 683–84 (1950), asserted that the State Board's decision to purchase and certify the Diebold DRE machines must be reviewed under the "arbitrary and capricious" standard of review, the standard applied by the Circuit Court.

In applying this standard, the appellees proffered that the State Board's decision was supported by a rational evaluation process. It is the appellees' contention that the appellants did

not, and could not, demonstrate that the State Board acted arbitrarily and that the State Board had, in fact, "shown that it addressed the alleged vulnerabilities in the older versions of the software and improved other aspects of security, after reviewing the critical Rubin, SAIC, and RABA reports." According to the appellees, the appellants could not "clearly articulate a proposed remedy . . . that: has not already been considered and implemented or rejected by the SBE; would effectively increase security by a significant amount in light of the cost of implementation, and, that is feasible at this late date."

Likewise, the appellees argued that it cannot be shown that the Circuit Court abused its discretion in finding that the Deibold voting system was secure. Citing to the testimony of Dr. Shamos, and to the appellees' own witnesses, who agreed that, on the issues of security, "knowledgeable persons could disagree," the appellees asserted that the Circuit Court "certainly properly exercised its discretion to credit that testimony." Moreover, the appellees posited that the Circuit Court exercised sound discretion in weighing the testimony of all of the experts and crediting the most "reasonable," as there is nothing in the applicable statutory law that requires absolute security. The appellees explained, even if the standard were the "most secure" system, there was an ample record available for the Circuit Court to conclude that the Diebold DRE system was, in fact, the most secure system available.

### B.

Assuming *arguendo* the correctness of the Circuit Court's incorporation of Dr. Shamos' "reasonableness" standard, the appellants argue, that the record, as a whole, did not support the denial of injunctive relief. First, the appellants alleged that there was present at the hearing, conclusive evidence that they were likely to succeed on all of the issues raised in their preliminary injunction motion. Again criticizing the Circuit Court's reliance on Dr. Shamos' testimony, the appellants proffered that their experts, who are regarded as "forefront researchers in the field," were more qualified than Dr. Shamos

and that, therefore, their opinions should have been given greater deference. The appellants urged this Court to set aside the Circuit Court's findings "in light of the weight of evidence to the contrary."

The appellants also asserted that the Circuit Court erred in its rejection of their request for partial relief. They submitted that the Circuit Court "focused almost exclusively on the paper ballot option," and summarily concluded that the State Board had implemented all reasonable recommendations. Moreover, the appellants alleged that the Circuit Court abused its discretion by not taking into account all of the evidence, claiming that the court "did not assess or mention" various reports [34] and "failed to address" the testimony of certain witnesses, particularly their witnesses.

Next, the appellants contended, balancing the harm to them with that to the appellees, that their "modest request" for relief would only require the State Board to "exert a little more effort." The appellants stated further that any extra effort required on the part of the State Board can be attributed to its own unwillingness to act sooner, thus not truly causing the State Board any "harm." On the other hand, the appellants maintained that they were harmed by the Circuit Court's delay in hearing their complaint. They argued that their right to the relief they initially sought, i.e. decertification and a voter-verified audit trail, was lost, not on the merits of the case, but as a result of the Circuit Court's inaction. Moreover, the appellants posited that the Circuit Court's

34. The reports to which the appellants refer are the CalTech/MIT study, the EAC Guidelines, and the Brennan Center–LCCR Report. These reports, however, were admitted into evidence and, thus, were available for the Circuit Court's review. The fact that the court did not mention this evidence in its written opinion does not suggest that it was not considered. It is within the Circuit Court's discretion to weigh and credit the evidence as it sees fit. It may pick and choose which items to credit. See Sessoms v. State, 357 Md. 274, 293, 744 A.2d 9, 19 (2000) ("[A trial court] may believe or disbelieve, credit or disregard, any evidence introduced, and a reviewing court may not decide on appeal how much weight must be given to each item of evidence"). We are, thus, not persuaded by the appellants' argument.

ultimate denial of their claim for partial relief on the grounds that it was too late for its implementation, caused them irreparable harm.

Finally, the appellants contended, *quoting Common Cause v. Jones*, 213 F.Supp.2d 1110, 1113 (C.D.Cal.2002), that it is "self-evident that replacing voting systems that deprive individuals of the right to vote is clearly in the public interest." They asserted further that the interest of the public will be served by the occurrence of a "timely election that reflects the will of the voters." [35]

The appellees, on the other hand, contended that it was unlikely that the appellants would succeed on the merits. According to the appellees, the appellants failed "to show the relative merits of alternative voting systems with respect to security[,] nor was there any 'basis for a claim that some other voting system more closely satisfies the certification requirements of the statute.'" In addition, the appellants' relief sought is illegal under federal and Maryland law, violating "the mandate to make voting equally accessible to the blind [under the Americans with Disabilities Act] and the State statutory requirement that a voting system, to be certified, must protect the secrecy of the ballot." *See* § 9–102(c)(1)(i).

The appellees maintained that the trial court "expressly undertook to balance the hardships" and correctly found it "to tilt markedly against injunctive relief." As stated above, blind voters would be harmed by the grant of an injunction. No system suggested by the appellants was accessible to blind voters, thus causing these individuals ultimately to have to choose between "secrecy and confidence in the system." The appellees also argued that the exorbitant cost of the appellants' paper ballot option, coupled with the risks that the

---

35. The appellants, on brief, set forth an additional argument pertaining to the record, stating that:

"[T]he Circuit Court abused its discretion by refusing to consider the record as a whole and allowing the appellees to develop a one-sided and untested partial record."

We will not address this evidentiary issue, in view of the Circuit Court's credibility findings.

introduction of that system would potentially create, would cause them considerable harm. The appellees claimed that the appellants, on the other hand, would not suffer any harm if injunctive relief were not granted.

The appellants, the appellees submitted, managed to demonstrate only a hypothetical risk of irreparable harm. They argued further that the harms proposed by the appellants "had never materialized in any of the more than 20 Maryland elections where the Diebold AccuVote–TS DRE machines have been used" and that the appellants delay in bringing their action undermined their claim of irreparable harm. Moreover, the appellees posited, the appellants acted unreasonably in waiting months, arguably years, to bring their claim. It was the appellees' belief that "there is no injury, much less irreparable one, if injunctive relief is denied."

Finally, in looking at whether the public interest will be served by a grant of injunctive relief, the appellees proffered that the public interest is not represented by the eight appellees in this matter, but, instead by the millions of Maryland voters who will use the Diebold DRE machines in the November 2004 elections. Thus, the public interest, the appellees argued, would be served by not allowing eleventh hour challenges to the elections process, which could result in changes that would undoubtedly cause much voter confusion. Moreover, as they did below, the appellees asseverated that "it is not in the public interest to create a precedent where each dissatisfied voter or group of voters has the power to select their own voting system." Nor is it in the public interest to replace a secure DRE voting system with a less secure paper option.

## IV.

As stated above, the assignments of error made in the case *sub judice* are the appellants' contentions that the Circuit Court erred in its adoption of Dr. Shamos' "reasonableness" standard and in its denial of their injunctive relief.

 To be sure, the attribution of credibility to a witness is a finding of fact. Maryland Rule 8–131, providing:

"c) Action tried without a jury. When an action has been tried without a jury, the appellate court will review the case on both the law and the evidence. *It will not set aside the judgment of the trial court on the evidence unless clearly erroneous,* and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses,"

(emphasis added), governs the standard of review for questions of fact. *See YIVO Inst. For Jewish Research v. Zaleski,* 386 Md. 654, 662, 874 A.2d 411, 415 (2005); *Colandrea v. Wilde Lake Cmty. Ass'n, Inc.,* 361 Md. 371, 394, 761 A.2d 899, 911 (2000); *Real Estate Cent., Inc. v. Kramer,* 254 Md. 290, 293, 255 A.2d 81, 83 (1969); *Keyworth v. Israelson,* 240 Md. 289, 297, 214 A.2d 168, 172 (1965). If any competent material evidence exists in support of the trial court's factual findings, those findings cannot be held to be clearly erroneous. *YIVO Inst.,* 386 Md. at 662, 874 A.2d at 415; *Solomon v. Solomon,* 383 Md. 176, 202, 857 A.2d 1109, 1123 (2004).

 Next, this Court's "review of a preliminary injunction is limited because we do not now finally determine the merits of the parties' arguments." *Ehrlich v. Perez,* 394 Md. 691, 707, 908 A.2d 1220, 1229 (2006), *quoting LeJeune v. Coin Acceptors, Inc.,* 381 Md. 288, 300, 849 A.2d 451, 458 (2004), in turn, *citing Dep't of Transp. v. Armacost,* 299 Md. 392, 404, 474 A.2d 191, 197 (1984) (internal quotations omitted). It is a well settled and frequently stated principle that the granting or denial of a request for injunctive relief rests within the sound discretion of the trial court. *See Eastside Vend Distribs., Inc. v. Pepsi Bottling Group, Inc.,* 396 Md. 219, 240, 913 A.2d 50, 63 (2006); *Lerner v. Lerner,* 306 Md. 771, 776, 511 A.2d 501, 504 (1986); *Welde v. Scotten,* 59 Md. 72, 73 (1882); *See also Aventis Pasteur, Inc. v. Skevofilax,* 396 Md. 405, 419, 914 A.2d 113, 121 (2007), *quoting Wilson,* 385 Md. at 199, 867 A.2d at 1084 ("[A]n abuse of discretion [by the trial court] should only be found in the extraordinary, exceptional, or most egregious case"); *State Dep't of Health & Mental Hygiene v. Baltimore County,* 281 Md. 548, 550, 383 A.2d 51, 53 (1977)

("[I]t is a rare instance in which a trial court's discretionary decision to grant or deny a preliminary injunction will be disturbed by this Court"). Such a decision will not be disturbed on appeal unless that discretion has been abused. *City of Bowie v. Mie Props., Inc.*, 398 Md. 657, 676–77, 922 A.2d 509, 521 (2007), *citing Colandrea*, 361 Md. at 394, 761 A.2d at 911; *Schisler v. State*, 394 Md. 519, 534–35, 907 A.2d 175, 184 (2006); *Perez*, 394 Md. at 707, 908 A.2d at 1229; *State Comm'n on Human Relations v. Talbot County Det. Ctr.*, 370 Md. 115, 127, 803 A.2d 527, 534 (2002). The abuse of discretion standard has been defined as "discretion manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons." *Jenkins v. City of College Park*, 379 Md. 142, 165, 840 A.2d 139, 153 (2003), *quoting Goodman v. Commercial Credit Corp.*, 364 Md. 483, 491–92, 773 A.2d 526, 531–32 (2001), in turn, *quoting In re Don Mc.*, 344 Md. 194, 201, 686 A.2d 269, 272 (1996). In other words, an abuse of discretion occurs when "no reasonable person would take the view adopted by the [trial] court[.]" *Wilson v. John Crane, Inc.*, 385 Md. 185, 198, 867 A.2d 1077, 1084 (2005), *quoting In re Adoption/Guardianship No. 3598*, 347 Md. 295, 312, 701 A.2d 110, 118 (1997) (brackets in original); *Rios v. Montgomery County*, 386 Md. 104, 121, 872 A.2d 1, 10 (2005); *Metheny v. State*, 359 Md. 576, 604, 755 A.2d 1088, 1104 (2000).

## V.

### A.

██ Turning first to the appellants' argument pertaining to the Circuit Court's "wholesale" adoption of Dr. Shamos' testimony, this Court is not persuaded that it resulted in any error on the Circuit Court's part. As the summary of testimony earlier illustrates, there is substantial evidence which tends to support the disputed factual allegations of all of the parties. In other words, evidence offered by the parties was conflicting to some degree in many aspects. Accordingly, the responsibility for resolving those conflicts lies with the Circuit Court, *see* Maryland Rule 8–131(c), *supra,* as it is in the best position, a

position far more superior than that of an appellate court, to evaluate and weigh such evidence. As noted earlier, if there is any competent, material evidence in support of the trial court's factual findings, those findings cannot be held to be clearly erroneous.

In the case *sub judice*, the record is laden with material evidence supporting the Circuit Court's decision to credit Dr. Shamos' testimony over the other experts. We agree with the appellees that it is evident from its written opinion that the Circuit Court acknowledged and weighed the testimony of all of the trial experts. Although the appellants would urge this Court to credit the testimony of Dr. Wertheimer over Dr. Shamos, and, thus, find error in the Circuit Court's actions, we simply cannot, and will not, do so. The appellants argue that, because the Maryland Legislature commissioned Dr. Wertheimer and his RABA team, that Dr. Wertheimer's higher, "industry norm" standard is the correct standard, and that standard should be applied in the assessment of Maryland's voting system. Stated more precisely, the appellants proclaim that "the very fact that the Maryland legislature hired RABA to determine whether the election system was sufficiently secure indicates a *fortiori* that the standard of security applied by RABA and Dr. Wertheimer is what the legislature viewed as the appropriate standard of care." The appellants are simply incorrect.

Albeit regarding administrative proceedings, this Court finds guidance on the issue of witness credibility in *A.H. Smith Sand and Gravel v. Department of Water Resources*, 270 Md. 652, 667, 313 A.2d 820, 828 (1974), where we "observed that an expert's opinion is of no greater probative value than the soundness of his reasons given therefor will warrant." See *Surkovich v. Doub*, 258 Md. 263, 272, 265 A.2d 447, 451 (1970); *Creswell v. Baltimore Aviation*, 257 Md. 712, 721, 264 A.2d 838, 843 (1970); *Miller v. Abrahams*, 239 Md. 263, 273, 211 A.2d 309, 314 (1965). That the RABA team was commissioned by the Legislature does not make its assessment of the voting system correct, nor does it bind the trial court to accept that opinion. In the case *sub judice*, there is no doubt that, to

believe one expert would be to disbelieve another; the issue is, thus, credibility. The Circuit Court found Dr. Shamos to be more credible than the other witnesses. It is of no consequence whether his opinion was the only contrary one, or whether he was commissioned by the appellees instead of the Legislature, as these considerations are not determinative of his credibility. Affording it "due regard in its opportunity to judge the credibility of the witnesses," this Court holds that the Circuit Court was well within its discretion to deem Dr. Shamos' testimony credible. We, thus, reject the appellees' arguments on this issue.

### B.

The appellants fare no better on their preliminary injunction argument. In determining whether entry of a preliminary injunction was appropriate, we consider the following factors: "(1) the likelihood that the plaintiff will succeed on the merits; (2) the 'balance of convenience' determined by whether greater injury would be done to the defendant by granting the injunction than would result by its refusal; (3) whether the plaintiff will suffer irreparable injury unless the injunction is granted; and (4) the public interest." *Perez*, 394 Md. at 708, 908 A.2d at 1230, *citing Armacost*, 299 Md. at 404–05, 474 A.2d at 197; *Fogle, supra*, 337 Md. 441, 455–56, 654 A.2d 449, 456 (1995); *State Dep't of Health*, 281 Md. at 554, 383 A.2d at 55. The burden of producing evidence to show the existence of these four factors is on the moving party and "failure to prove the existence of even one of the four factors will preclude the grant of preliminary injunction relief." *Perez*, 394 Md. at 708, 908 A.2d at 1230, *citing Fogle*, 337 Md. at 456, 654 A.2d at 456. "With regard to the factor of the likelihood of success on the merits, 'the party seeking the interlocutory injunction must establish that it has a real *probability* of prevailing on the merits, not merely a remote *possibility* of doing so.'" *Perez*, 394 Md. at 708, 908 A.2d at 1230, *quoting Fogle*, 337 Md. at 456, 654 A.2d at 456 (emphasis in original).

Moreover, "in litigation between governmental and private parties, or in cases in which injunctive relief directly impacts governmental interests, 'the court is not bound by the strict requirements of traditional equity as developed in private litigation,'" *Fogle*, 337 Md. at 456, 654 A.2d at 457, *quoting State Dep't of Health*, 281 Md. at 555, 383 A.2d at 51, and courts "may, and frequently do, go much farther both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved." *Fogle*, 337 Md. at 456, 654 A.2d at 457, *quoting Space Aero Prods. Co., Inc. v. R.E. Darling Co. Inc*, 238 Md. 93, 128, 208 A.2d 74, 92, *cert. denied*, 382 U.S. 843, 86 S.Ct. 77, 15 L.Ed.2d 83 (1965).

Keeping in mind the standard of review, we do not determine the merits of the parties' arguments, but, instead, review the Circuit Court's actions, determining whether they could constitute an abuse of discretion. We shall hold that the Circuit Court did not abuse its discretion in its consideration and balancing of the factors pertinent to the review of the appellants' request for injunctive relief.

In order for the appellants to prevail on the merits, they would have to establish that the State Board erroneously selected and certified the Diebold DRE machines. As we have seen, the appellants argue that the Circuit Court erred in its use of deferential review, under an "arbitrary and capricious" standard, of the State Board's decision. In proffering their argument, the appellants mischaracterize both the role of the State Board, as well as that of this Court.

To be sure, this Court has held that we review "the discretionary functions of [an] agency under a standard more deferential than either the *de novo* review afforded an agency's legal conclusions or the substantial evidence review afforded an agency's factual findings," that is, the "arbitrary and capricious" standard. *Spencer v. Md. State Bd. of Pharmacy*, 380 Md. 515, 529, 846 A.2d 341, 349 (2004) (holding that intermediate appellate court erred when it compelled an administrative agency to take specific action in a matter statuto-

rily committed to the discretion of the agency). *See Christopher v. Montgomery County Dep't. of Health and Human Servs.*, 381 Md. 188, 199, 849 A.2d 46, 52 (2004) ("[The Court] owe[s] a higher level of deference to functions specifically committed to the agency's discretion"); *Baltimore Import Car Serv. & Storage, Inc. v. Md. Port Auth.*, 258 Md. 335, 342, 265 A.2d 866, 869 (1970) ([W]hen an administrative agency is vested with discretion, and exercises it within the scope of its authority, the courts will not intervene and substitute their judgment[.] ); *Glen Burnie Imp. Ass'n, Inc. v. State Appeal Bd.*, 213 Md. 407, 412, 132 A.2d 451, 453 (1957) (Courts have inherent power by mandamus, injunction or otherwise to correct abuses of discretion and arbitrary, illegal, capricious or unreasonable acts of an administrative agency, but care must be taken not to interfere with the legislative prerogative or with exercise of sound administrative discretion, where discretion is clearly conferred); *Town of Dist. Heights v. County Comm'rs of Prince George's County*, 210 Md. 142, 146, 122 A.2d 489, 492 (1956) (same); *Heaps v. Cobb*, 185 Md. 372, 379, 45 A.2d 73, 76 (1945) (same). We have enunciated further:

> " 'In those situations where an administrative agency is acting in a manner which may be considered legislative in nature (quasi-legislative), the judiciary's scope of review of that particular action is limited to assessing whether the agency was acting within its legal boundaries.' *Weiner v. Ins. Admin.*, 337 Md. 181, 190, 652 A.2d 125 (1995) (quoting *Linchester, supra*, 274 Md. at 224, 334 A.2d 514); *Judy v. Schaefer*, 331 Md. 239, 265–66, 627 A.2d 1039 (1993) (recognizing that the scope of judicial review is more limited when the agency action is quasi-legislative, not quasi-judicial); *Storch v. Zoning Bd. of Howard* Co., 267 Md. 476, 487, 298 A.2d 8 (1972)."

*Fogle*, 337 Md. at 454, 654 A.2d at 455.

It is our view that the selection and certification of a uniform voting system, a function that we agree with the appellees to be a matter of policy or quasi-legislative in nature, taking into consideration the nature of the statutory requirements which give the State Board broad discretion to weigh

various factors and ultimately decide on a system, should be reviewed under "the arbitrary and capricious" standard. Accordingly, the Circuit Court, in reviewing the State Board's actions, was, as the appellees argue, bound to give the decision deference. The State Board is, no doubt, in a better position to carry out the charge delegated to it than any other entity, including this Court. The appellants, as mentioned early, would urge this Court to compel the State Board to adopt certain security measures; however, we are not in the position to do so. Contrary to the appellants' belief, it is not this Court that should ultimately decide on the State's voting system, but the State Board, to which that power was expressly delegated. Our role in this matter is that of arbiter, not policy maker. That being said, it is evident that the Circuit Court did not abuse its discretion when, after considering the decision of the State Board and the record as a whole, and reviewing the action for regularity, it found that the State Board acted reasonably in its selection, and subsequent certification, of the Diebold voting system, thus denying the injunction. Accordingly, the Circuit did not err in its finding that the appellants were not likely to prevail on their claim.

To be sure, the Circuit Court characterized the harm to the appellants as hypothetical and that to the appellees as real. The record demonstrates that that characterization was not unsupported. The record reflects that the appellants did not prove that they would be harmed in any way if the Diebold system was implemented. Conversely, the State Board proffered evidence that it would suffer real harm if an injunction were granted. If this Court were to grant an injunction, the evidence showed, the State Board would have to absorb the cost of implementing a paper ballot option and the extensive education that would then be required. *See Direx Israel, Ltd. v. Breakthrough Med. Corp.,* 952 F.2d 802, 812 (4th Cir.1991) (" '[I]rreparable harm' must be 'neither remote nor speculative, but actual and imminent.' "), *quoting Tucker Anthony Realty Corp. v. Schlesinger,* 888 F.2d 969, 975 (2d Cir.1989); *Scotts Co. v. United Indus. Corp.,* 315 F.3d 264, 283 (4th Cir.2002); *ECRI v. McGraw–Hill, Inc.,* 809 F.2d 223, 226 (3d

Cir.1987) ("Establishing a risk of irreparable harm is not enough. A plaintiff has the burden of proving a clear showing of immediate irreparable injury"); *Dan River, Inc. v. Icahn,* 701 F.2d 278, 284 (4th Cir.1983) (noting that the irreparable harm to be suffered must be both "actual" and "immediate"). Further, such an option, as both the appellees and the Circuit Court correctly recognized, had the potential to cause voter confusion, particularly when implemented at such a late date in the election process. There is also the matter of visually impaired voters being disenfranchised. The balance of hardships is in the appellees' favor.

Finally, the record indicates that the State Board's selection and certification of the Diebold machines was reasonable, thus, serving the interest of the public.

This Court has held that "injunctive relief may be inappropriate in an elections case if the election is too close for the State, realistically, to be able to implement the necessary changes before the election." *Liddy v. Lamone,* 398 Md. 233, 245, 919 A.2d 1276, 1284 (2007). *See, e.g., MacGovern v. Connolly,* 637 F.Supp. 111, 115 (D.Mass.1986), *quoting Reynolds v. Sims,* 377 U.S. 533, 585, 84 S.Ct. 1362, 1394, 12 L.Ed.2d 506, 541 (1964) (recognizing that "in awarding or withholding relief, a court should ... endeavor to avoid a disruption of the election process which might result from requiring precipitate changes that could make unreasonable or embarrassing demands on a State in adjusting to the requirements of the court's decree"); *Farnum v. Burns,* 548 F.Supp. 769, 774 (D.R.I.1982) (noting that "equitable principles may require a court *not* to interfere with the conduct of rapidly upcoming elections where the election machinery is already in gear") (emphasis added); *Barthelmes v. Morris,* 342 F.Supp. 153, 160 (D.Md.1972) (stating that although "the election process is one fraught with uncertainty[, i]t does not follow [ ] that a court should add a further element of wholly unanticipated uncertainty into the process at the eleventh hour").

We agree with the appellees, and with the trial court, that a change in voting systems at the late date that this case

involved, would have done more harm than good. There was no guarantee that the appellants' proposed remedy, *i.e.* the implementation of specific security measures and a paper ballot option, would have resulted, in fact, in a "secure" election. No system is infallible.

In sum, the Circuit Court's weighing of the evidence and careful consideration of each applicable factor led it to the conclusion that the appellees would not likely prevail on the merits of any of the claims they advanced. We agree. Despite there being conflicting evidence, the record contained ample evidence to support the Circuit Court's ruling.

For the foregoing reasons, we affirm the judgment of the Circuit Court.