## ELECTION LAW

**VOTING SYSTEMS – STATUTORY CONSTRUCTION – REQUIREMENT THAT VOTING SYSTEMS NOT CREATE A "SEGREGATED BALLOT" FOR VOTERS WITH DISABILITIES**

December 18, 2013

*Linda H. Lamone*
*Administrator, State Board of Elections*

On behalf of the State Board of Elections ("SBE" or "the State Board"), you have requested our opinion regarding the meaning of the term "segregated ballot" as it appears in the statutory requirements governing the certification of voting systems for use in Maryland. Those requirements specify that a voting system, to be certified, must meet certain State and federal standards and "provide access to voters with disabilities that is equivalent to access afforded voters without disabilities without creating a segregated ballot for voters with disabilities." Md. Code Ann., Election Law ("EL") § 9-102(f)(1). The requirements set forth in § 9-102 also specify that the voting system must be based on the preparation of a voter-verifiable paper ballot. Because many voters with disabilities are unable to prepare a hand-marked paper ballot, however, the voting systems will need to include a computerized ballot-marking device that allows the voter to make selections through other non-written means and then print a paper copy of the ballot.

The State Board of Elections ("SBE") has begun the process of selecting a new optical scan voting system for use in Maryland beginning with the 2016 Presidential Election. The first step in that process is the certification of those voting systems that are compliant with Maryland's standards. It is within this context that you ask what constitutes a "segregated ballot" under State law. Specifically, you ask:

> 1. Does segregation occur by virtue of the fact that the ballot created by the ballot marking device is different and distinguishable from the hand marked ballots? Or, does segregation only occur if ballots are cast, counted, and stored in a physically separate and distinct manner?

> 2. Does the determination of whether a segregated ballot has been created depend in

part on how the system is intended to be deployed and utilized? For example, assume the ballot marking device could be deployed in a manner such that it is an optional voting method for all voters, as opposed to only an accessible voting solution for voters with disabilities. Would such a deployment and utilization affect the analysis of what constitutes a segregated ballot?

In our opinion, the General Assembly, by using the term "segregated ballot," intended to ensure that the ballots cast by voters with disabilities could not be identified as such during the process of casting, counting, and, if necessary, re-counting the paper ballots cast in an election. As we see it, the State Board has three options for certifying voting systems that can be used without creating a segregated ballot for voters with disabilities. First, SBE may require all voters to use a voting system that is accessible to voters with disabilities. This option would not segregate ballots in any way, but the cost and inefficiency of such a system—which the statute requires SBE to consider—might weigh against it. Second, SBE may certify an accessible voting system that generates a ballot that is formally identical to those ballots cast by non-disabled voters so long as all ballots are cast, counted, and stored together. Finally, after considering the legislative history and the definitions and usage of the term "segregated," we conclude that the statute permits SBE to certify an accessible voting system that generates a non-identical ballot, so long as voting procedures are implemented to ensure that non-disabled voters use the accessible system as well and do so in sufficient numbers to prevent the resulting ballots from being identified as having been cast by voters with disabilities.

# I

## Background

As the twentieth century came to a close, Maryland's voting infrastructure comprised a wide variety of voting systems, with each county responsible for choosing which type of system to employ. *See* 97 *Opinions of the Attorney General* 32, 36 n.7 (2012) (describing how, by 2000, Maryland counties employed four different types of voting systems: punch-card, mechanical lever, optical scan, and direct-recording electronic touchscreen). The experience of the 1994 gubernatorial election, with its narrow margin and vote count problems, highlighted the "myriad of administrative problems" associated with Maryland's patchwork

quilt of voting systems. *Schade v. Maryland State Bd. of Elections*, 401 Md. 1, 8 (2004). The potential significance of those problems was magnified by the 2000 presidential election and the national attention it focused on the "unfortunate number" of ambiguous ballots produced by punch-card balloting machines. *Bush v. Gore*, 531 U.S. 98, 104 (2000); *see also* 97 *Opinions of the Attorney General* at 34-37.

In 2001, the General Assembly responded with legislation to modernize the conduct of elections in Maryland. The legislation mandated a uniform, statewide, voting system for State and federal elections and charged a single agency—the State Board—with overseeing the operation of that system. Under this new system, SBE, "in consultation with the local boards [of elections]," was given the authority to "select and certify a voting system for voting in polling places and a voting system for absentee voting." 2001 Md. Laws, ch. 564; EL § 9-101(b). The State Board, following the directive in the 2001 legislation, then certified, selected, and procured a "direct recording electronic" or "DRE" unit, which provides for the voting and tabulation of votes directly by a computerized touchscreen system without the need for paper ballots.[1] *See generally Schade*, 401 Md. at 7-9; 97 *Opinions of the Attorney General* at 36-37.

The new DRE system certified by SBE represented an advance over the previously-used paper ballot systems in many respects. The computerized systems eliminated the need to interpret ambiguous handwritten ballots, allowed for easier and more efficient re-counts, and in some ways made the voting process more user-friendly. *Schade*, 401 Md. at 8-9. Most relevant to our purposes, the touchscreen system included features that enabled many voters with disabilities to cast their ballots without assistance, *id*. at 9, and in a manner that made their ballots indistinguishable from non-disabled voters. As the Court of Appeals observed in *Schade*, the touchscreen system represented the "first time [that] blind voters were able to vote independently and secretly" on the same basis as non-disabled voters. *Id.* at 21.

---

[1]  Absentee and provisional ballots—which are completed on paper— were tabulated through the use of an optical-scan system. *See*, *e.g*., State Board of Elections, Overview of Maryland's Voting System, http://www.elections.state.md.us/voting_system/index.html (last visited Dec. 9, 2013).

Although the touchscreen system represented a step forward in many respects, some observers believed that it came at the cost of election integrity because the system did not leave a "paper trail" that would allow for independent verification of the accuracy of the vote tabulation. Because the voter's selections on the touchscreen were recorded by computer and computer alone, the paper ballot image that the system was able to generate merely verified the *computer's* selections, not the voter's. *Id*. at 18 n.22. Concerns about electronic security and the potential for vote manipulation prompted opponents of the new DRE system to file suit to block its use in the 2004 presidential election. That litigation[2] culminated in *Schade*, in which the Court of Appeals upheld SBE's procurement of the DRE systems as a reasonable exercise of the "broad discretion" delegated to it by the General Assembly. *See id.* at 38-39.[3]

Undaunted, the opponents of the computerized system turned to the Legislature and there found success. In 2007, the General Assembly enacted legislation directing SBE to certify, for use in elections after January 1, 2010, a voting system that would provide a "voter-verifiable paper record." EL § 9-102(d)(1)(vii). A voter-verifiable paper record is defined as "a paper ballot" that is either "prepared by the voter for the purpose of being read by a precinct-based optical scanner," "mailed to the applicable local board," or "created through the use of a ballot marking device." EL § 9-102(a). As required by statute, the paper record must be an individual document that is "not part of a continuous roll"; it must be "sufficiently durable to withstand repeated handling for the purposes of mandatory random audits and recounts"; and it must "use[] ink that does not fade, smear, or otherwise degrade and obscure or obliterate the paper record over time." EL § 9-102(d)(1)(vii); 2007 Md. Laws, chs. 547, 548.[4]

---

[2] The litigation was brought by "a group of registered Maryland voters and candidates." *Schade*, 401 Md. at 13. SBE defended its decision, and the National Federal of the Blind intervened in support of SBE. *Id*. at 15.

[3] The Court initially announced its decision by Order issued after oral argument on September 14, 2004. *Schade v. Maryland State Bd. of Elections*, 383 Md. 208 (2004). The Court later set forth its reasoning in an opinion issued on August 24, 2007. *See* 401 Md. at 25.

[4] The General Assembly passed two identical, cross-filed bills—S.B. 392 and H.B. 18—which were subsequently signed by the Governor.

Advocates for the disability community opposed the legislation in part on the grounds that it would compromise the secrecy of disabled voters' selections. Because many voters with disabilities are unable to mark paper ballots, they would have to use "ballot marking device[s]," EL § 9-102(a)(3), to make their selections without assistance. The advocates expressed the concern that the resulting ballots—particularly if cast, counted, and stored separately—could be identified as having been cast by a voter with disabilities, and they proposed an amendment to address the problem. In an effort to alleviate these concerns while still providing for a paper trail, the General Assembly adopted the proposed amendment drafted by one of the opponents of the legislation and enacted the provision we must construe here:

> A voting system selected, certified, and implemented under this section shall . . . provide access to voters with disabilities that is equivalent to access afforded voters without disabilities without creating a segregated ballot for voters with disabilities.

EL § 9-102(f)(1).

For reasons not relevant to this opinion, SBE is just now beginning the process of certifying and selecting a new optical scan voting system for use in polling places. A polling-place optical scan voting system requires the voter to fill out a paper ballot by using a pen or other ink-based marker. That ballot is then fed into a scanner that reads and counts the voter's selections. Voters who have disabilities that prevent them from hand-marking paper ballots and who wish to vote without the assistance of others must use a ballot-marking device that provides a touchscreen interface for the voter to make his or her selections. The ballot is printed, scanned by the optical scan voting unit, and then stored in the same ballot box as the hand-marked ballots.

You have stated that some ballot-marking devices might produce ballots that are different from those that are hand-marked. For example, the ballots might show only the voter's selections and not the full contests, the ballots might be a different size from the ballots generated by non-disabled voters, or there may be a barcode at the top of the ballot. You asked whether any of these differences mean that those ballots are "segregated" in violation of § 9-102(f)(1), or whether segregation occurs only when those ballots are cast, counted, and stored in a physically separate and distinct manner. In addition, you asked whether making the accessible

system available to all voters could prevent segregation of the ballots.

## II

### Analysis

The meaning of the term "segregated ballot" within § 9-102(f)(1) is a matter of statutory construction, the cardinal rule of which is "to ascertain and effectuate the real and actual intent of the Legislature." *Lockshin v. Semsker*, 412 Md. 257, 274 (2010).

> To ascertain the intent of the General Assembly, we begin with the normal, plain meaning of the language of the statute. If the language of the statute is unambiguous and clearly consistent with the statute's apparent purpose, our inquiry as to legislative intent ends ordinarily and we apply the statute as written, without resort to other rules of construction. . . . Where the words of a statute are ambiguous and subject to more than one reasonable interpretation, or where the words are clear and unambiguous when viewed in isolation, but become ambiguous when read as part of a larger statutory scheme, a court must resolve the ambiguity by searching for legislative intent in other indicia, including the history of the legislation or other relevant sources intrinsic and extrinsic to the legislative process. . . . In every case, the statute must be given a reasonable interpretation, not one that is absurd, illogical, or incompatible with common sense.

*Id*. at 274-76 (citations omitted).

The statute itself does not resolve the issue; it neither defines the term "segregated ballot" nor suggests by its structure or context a specific meaning. Rather, as your questions suggest, the term could be read to imply *difference*, and require that the ballot created by the ballot-marking device be indistinguishable from hand-marked ballots, or it could imply *separation*, and require only that ballots cast by disabled voters not be counted or stored separately from all others. Neither meaning is clear from the text. To resolve the statutory ambiguity, we will look to the usage of the term

"segregated ballot" in other authorities, the dictionary definition of "segregated," and the legislative history of § 9-102(f)(1).

### A. The Use of "Segregated Ballot" in Other Contexts and the Dictionary Definition of "Segregated"

There are no reported cases in Maryland or other jurisdictions that construe the term "segregated ballot." However, one Maryland case and a few authorities in other jurisdictions have used the term in passing. The Maryland case used the term "segregated ballot" to describe absentee ballots that had been set aside because they lacked the statutorily-required application to submit such a ballot. *See Pelagatti v. Board of Supervisors of Elections for Calvert County*, 343 Md. 425, 433 n.8 (1996) (observing that "of the 19 segregated ballots found to be lacking applications, 14 were for O'Donnell, 3 were for Pelagatti, and 2 were for neither candidate"). The only two reported cases from other jurisdictions use the term in a similar way to describe ballots that, because of some irregularity, have been set aside. *See Finkelstein v. Stout*, 774 P.2d 786, 793 (Alaska 1989) (on remand, requiring lower court to deduct the "nine segregated ballots" that were determined to be illegal and had been "counted but not commingled" with the other ballots); *Powers ex rel. LaBelle v. Monahan*, 132 A.2d 97, 99 (R.I. 1957) (describing contention that "the board of canvassers erred in rejecting the three segregated ballots" that were in dispute because of stray markings). These few cases suggest that the term "segregated ballot" denotes separation, rather than difference.[5]

We also looked for the term "segregated ballot" in the federal election laws and regulations as well as those of other states. Maine has the only state or federal statute or regulation that uses the term,

---

[5] A number of other cases, even though they do not use the term "segregated ballot," refer in passing to ballots that must be "segregated" in some way. As best as we can tell, all of these cases also use the word "segregated" to mean some form of separation and not a mere difference between ballots. *See, e.g., Rossello-Gonzalez v. Acevedo-Vila*, 483 F.3d 1, 4 (1st Cir. 2007) (noting that three disputed ballots were "segregated" from the others); *Unger v. Superior Court*, 37 Cal. 3d 612, 633 (1984) ("Candidates for the 'judicial,' 'school' and 'county and township' offices should be segregated from the partisan offices on the ballot."); *State ex. Rel. Lukovich v. Johnston*, 150 Tex. 174, 178 (1951) ("'Where illegal votes can be segregated, only those votes should be thrown out, and the entire vote need not be impeached, but where it is impossible to separate improperly marked ballots from the others the votes of a whole district may be excluded.'" (quoting 29 C.J.S. Elections 193)).

and uses it in the sense of being separate from other ballots. The Maine statute describes ballots that, because they have been "spoiled" by the voter, must be "segregate[d] . . . with any other spoiled ballots in an envelope labeled 'Spoiled ballots.'" 21-A M.R.S. § 693 (2013) (requiring the election official to "package and return the envelope of segregated ballots" in accordance with other provisions). Like the cases discussed above, the Maine statute does not interpret the term "segregated ballot," does not use it in a regulatory manner, and does not evaluate it within the context of the voting rights of people with disabilities. Nevertheless, its usage of the term is consistent with the cases that use the term to denote separation rather than difference.[6]

We turn next to the "ordinary, popular understanding of the English language" reflected in the dictionary to ascertain the meaning of the term "segregated." *Kramer v. Liberty Prop. Trust*, 408 Md. 1, 21 (2009) (internal quotation marks omitted). The Merriam-Webster Dictionary defines the term as:

> a. set apart or separated from others of the same kind or group ‹a *segregated* account in a bank›;
>
> b. divided in facilities or administered separately for members of different groups or races ‹*segregated* education›;

---

[6] Although Maine's is the only state code that uses the term "segregated ballot," many state codes use the word "segregated" to refer to ballots more generally, and each uses it to mean separation. Specifically, most of the statutes use the word to describe the manner in which some ballots must be physically separated from others. *See*, *e.g.*, Ala. Code § 17-10-2(a)(4) (provisional ballots cast pursuant to court order extending the time for closing the polls must be "segregated from other provisional ballots into a separate sealed container"); Idaho Code Ann. § 34-308 (requiring mail ballots to be segregated by precinct); S.D. Codified Laws § 12-21-27 (providing that, if challenged, a "ballot shall be adequately identified by the board as an exhibit and segregated by the board as a disputed ballot"); Va. Code Ann. § 24.2-629 (requiring that a voting system "segregate ballots containing write-in votes from all others"). Those statutes that do not use the word "segregated" to refer to the physical separation of ballots use it to refer to the separation of items on a ballot. *See*, *e.g.*, N.M. Stat. Ann. § 1-9-20 (requiring that a voting system generate ballots for primary elections that "segregate the choices . . . by party affiliation").

> c. restricted to members of one group or one race by a policy of segregation ‹*segregated* schools›

*Webster's Ninth New Collegiate Dictionary* 1063 (1989). All three definitions connote separation rather than difference and, like the authorities discussed above, they suggest that the General Assembly likely envisioned something more than the mere difference between ballots in using the term "segregated ballot." But they do not alone provide a clear answer. For that we turn to the legislative history, which indicates more clearly the Legislature's intent.

## B. *The Legislative History*

The bills that were enacted as Chapters 547 and 548 did not originally use the term "segregated ballot." *See* H.B. 18, S.B. 392, First Reader (2007). As explained above, the legislation's primary purpose was to provide an original paper record of a voter's choices. The lead sponsor of the House bill, Delegate Sheila Hixson, stated publicly that a paper trail would "give people a trust in their vote, that it really counted." *New Bill Would Create Voting Paper Trail by 2010*, Associated Press (March 21, 2007), *available at* safevotingmd.org/news/2007/pdfs-docs/3-21-acap-ap-fox21wjz.pdf. In addition, the advocates of a voting system with a voter-verified paper record emphasized their preference for a software-independent paper ballot that could be hand-counted during mandatory routine audits and, if necessary, during a recount. *See* Hearing on H.B. 18 Before the House Ways and Means Comm., 2007 Leg., Reg. Sess. (Feb. 1, 2007) (testimony of Stan Boyd, SAVE Our Votes); Hearing on S.B. 392 Before the Senate Educ., Health, and Envt'l Affairs Comm., 2007 Leg., Reg. Sess. (Feb. 22, 2007) (testimony of Progressive Maryland).

Although the bills were focused on providing a paper trail, they did include some provisions to protect the voting rights of people with disabilities:

> (a) a voting system selected, certified, and implemented under this section shall:
>
> (1) provide access to voters with disabilities that:
>
> (i) is equivalent to the access afforded to voters without disabilities;

> (ii) facilitates the casting of secret ballots by voters with disabilities; and

> (iii) fully complies with the Americans with Disabilities Act, P.L. 101–336, and the Help America Vote Act, P.L. 107–252; and

> (2) allow a voter to cast, inspect, verify, and correct the selections by both visual and nonvisual means.

> (b) at least one voting system in each polling place shall provide access for voters with disabilities and afford them the opportunity for private and independent inspection, verification, and correction of their ballots.

S.B. 392, First Reader (proposed EL § 9-108). Despite the existence of these protections, advocates for the disabled opposed the bills during committee hearings, expressing concern that the proposed requirements would not allow for disabled voters to "vote privately and independently." Hearing on S.B. 392 (written testimony of the Maryland Disability Law Center). For many disabled voters, the DRE units then in use provided for complete voter equality, such that a return to a voting system based on paper ballots represented a step backwards.

Although the disability community was unable to defeat the legislation, it was able to obtain an amendment to the disability protections in the bill to prohibit the use of a "segregated ballot." Specifically, the amendment required that a certified voting system not only must provide "access to voters with disabilities that is equivalent to access afforded voters without disabilities," but must do so "without creating a segregated ballot for voters with disabilities." EL § 9-102(f)(1).

The testimony of the advocates for the disabled indicates that the ultimate goal of the amendment was to ensure that the paper ballot voting system would be implemented in a way that protected the privacy of the selections made by disabled voters. Some of that testimony, however, suggests that the advocates' preferred means for achieving that goal was to require a single voting system for all voters. As the National Federation of the Blind of Maryland stated in its testimony on H.B. 18 before the House Ways and Means Committee:

> [T]his bill must be written not only to guarantee nonvisual access, but it must also guarantee that this nonvisual access must be an integral part of the system used by all voters. It is not acceptable to install a separate voting system for blind voters. Therefore, we recommend that . . . the definition of "equivalent access" should specifically prohibit ballot segregation, i.e., the ballots cast by voters using the accessibility features must not be segregated and counted separately from the ballots cast by the voters who do not use these features. If . . . ballot segregation is not expressly prohibited, blind voters will lose the assurance of casting secret ballots.

Hearing on H.B. 18 (written testimony of National Federation of the Blind of Maryland); *see also* Hearing on S.B. 392 (written testimony of The Freedom Center, Inc.) ("It is not acceptable to force people with disabilities to vote differently than everyone else . . . .").

Although requiring all voters to use the same voting system plainly would guarantee a non-segregated ballot, we see no evidence that the General Assembly intended through its use of the term "segregated ballot" to require that result. The Legislature could have expressly required the use of identical voting systems for all voters but did not do so. Instead, it required only that "[a]t least one voting system in each polling place on election day shall provide access for voters with disabilities in compliance with [§ 9-102(f)]." EL § 9-102(g)(1). Similarly, the Legislature could have prohibited the use of a segregated *voting system*. Instead it used the term "segregated ballot," which, as reflected in the dictionary definitions, cases, and statutes discussed above, refers most naturally to ballots that are or can be *handled* separately from others.

Based on the legislative history and the usage of the term in other authorities, we conclude that the prohibition on "segregated ballot[s]" was intended to enable disabled voters to vote privately and secretly, such that the votes they cast cannot be identified as having been cast by a disabled voter. A difference between ballots does not make them "segregated" *per se*, but if the ballot used by disabled voters—and, as discussed below, *only* disabled voters—has a different appearance from those ballots used by non-disabled voters, it would be identifiable as a ballot cast by a disabled voter. Even if the distinct ballots are scanned by the same optical scan unit and stored in the same ballot box with all other ballots, the ballots used by voters with disabilities would remain distinguishable and

thus capable of being "segregated," particularly in a recount. By the same token, even if all ballots were identical, those cast by disabled voters would still be distinguishable and, thus, "segregated," if they were counted and stored separately. Thus, it is neither difference nor separation by itself that controls, but a combination of the two. We understand a "segregated ballot" to be a ballot that has been made distinguishable from other ballots, whether by its form or handling, and resulting in a loss of privacy for the voter.

## C. SBE's Options in Certifying Accessible Voting Systems that Do Not Produce a "Segregated Ballot"

We believe that SBE has several options for certifying voting systems consistent with the statute's mandate that they provide "equivalent" access "without creating a segregated ballot." EL § 9-102(f)(1). First and perhaps most directly, SBE could certify any accessible voting system that meets the other requirements of the statute so long as *all* voters—disabled and non-disabled alike—cast their ballots through the use of that system. Under that approach, all ballots would be completed using a ballot-marking device and, thus, would be identical in appearance and impossible to be segregated.

We do not believe, however, that requiring all voters to use the same accessible voting system is the only way to avoid the creation of a segregated ballot. Indeed, it is our understanding that acquiring ballot-marking devices for all voters—including those who do not need them—would result in increased costs and inefficiency, factors that the statute specifically requires the State Board to consider in certifying an election system. *See* EL § 9-102(e)(3), (4). In light of SBE's duty to consider those factors, we believe that the State Board could certify a voting system specifically for use by disabled voters so long as the election process *as a whole* is designed to prevent the creation of a segregated ballot.

As we see it, there are at least two other ways in which SBE may certify an accessible voting system for use within an appropriately designed voting process. First, the State Board could certify a voting system dedicated to use by disabled voters so long as the system produces a ballot that (a) is identical in form to those cast by non-disabled voters, and (b) is cast, counted, and stored with other ballots. Although this approach would not necessarily address the concerns raised by all of the advocates for the disability community, it would achieve what appears to be principal goal of

the "segregated ballot" amendment, namely, to make it impossible to identify a ballot as having been cast by a disabled voter.[7]

Second, SBE could certify an accessible voting system that produces a ballot that is different in appearance from handwritten ballots so long as non-disabled voters are required to use the system in numbers sufficient to make it impossible to draw the conclusion that a ballot produced by the system was, or was likely to have been, cast by a disabled voter. If the accessible system is used in this way, it does not matter that the ballot is a different size, has a barcode at the top, or shows only the voter's selections and not the full contests. Provided that enough non-disabled voters use the same system, there would be no way to determine whether a specific ballot was cast by a disabled or non-disabled voter. Because the accessible system would be used by disabled and non-disabled voters alike, we believe that such a system would not result in the creation of a "segregated ballot" within the meaning of the statute.

We caution that, in order to proceed with this last option, it would not be sufficient simply to give non-disabled voters the *option* of using the accessible voting system. If using the accessible voting system requires more time and is more complicated—as we understand may be the case for some systems—a non-disabled voter may be unlikely to choose that option. And, if election judges are less comfortable with the operation of the accessible voting system, they might be reluctant to direct additional, non-disabled voters to that system. Consequently, if SBE elects to proceed in this fashion, it must establish randomized polling-place procedures to ensure that a significant number of non-disabled voters will use the accessible

[7] Although we understand that a ballot generated by a ballot-marking device might never be *identical* to those filled out by hand, the manufacturers of accessible voting systems appear to be making strides toward that goal. *See* Letter from Howard Cramer, Executive V.P. of Govt. Relations, Dominion Voting, to Adam D. Snyder, Chief Counsel, Opinions and Advice, Office of Attorney General (Aug. 29, 2013) (noting that Dominion has developed "a library of random individual types of oval marks that mimic the oval marks filled in by hand"). We believe it would be within SBE's "broad discretion" over voting system certification, *Schade*, 401 Md. at 38-39, to determine whether a particular distinguishing feature makes the ballot produced by a ballot-marking system sufficiently distinguishable from other ballots that it would constitute a prohibited "segregated ballot" even when mixed with other ballots before counting. *See* 97 *Opinions of the Attorney General* at 39 (observing that "the standards in [EL] § 9-102 allow SBE considerable discretion to decide what sort of evaluation is appropriate and what level of performance will be deemed acceptable").

voting system.

We are not in a position to say how many ballots cast by non-disabled voters would be sufficient to render the ballots cast by disabled voters indistinguishable as such; that decision is properly left to SBE. We believe that the "broad discretion" afforded SBE to select a voting system, *Schade*, 401 Md. at 38-39, encompasses the discretion to devise polling-place procedures that will ensure that the system it selects is operated in a manner consistent with the statute. *See* EL § 9-102(i)(2) (requiring SBE to promulgate regulations that "specify the procedures necessary to assure that the standards of this title are maintained"). As the Court observed in *Schade*, "[t]he State Board is, no doubt, in a better position to carry out the charge delegated to it than any other entity . . . ." 401 Md. at 39; *see also id.* at 38-39 (SBE's decision regarding the selection and certification of voting systems is "a matter of policy or quasi-legislative in nature" and is subject to an arbitrary and capricious standard of review). It is our opinion that, so long as SBE develops and implements polling-place procedures that result in non-disabled voters using the accessible voting system in sufficient numbers to make the ballots cast by disabled voters unidentifiable as such, the State Board may certify and select any accessible voting system that meets the other requirements of the Election Law without creating a "segregated ballot."[8]

---

[8] We note that SBE regulations may already provide a model for determining how many non-disabled voters would have to use the accessible voting system in order to mask the votes cast by disabled voters. Those regulations provide that, to "preserve the secrecy of provisional ballots and absentee ballots," the local election boards must withhold from the "initial" canvasses "[a]t least five absentee ballots of each ballot style to be canvassed" during the provisional ballot canvass or the second absentee ballot canvass. COMAR 33.11.04.04A. It is our understanding that the purpose of holding back five ballots during the initial canvass is to ensure that the one or two ballots that typically come in during the second canvass cannot readily be attributed to the voters who cast them. Because the regulation provides for five ballots to mask one or two later ballots, it suggests that a substantial majority of the ballots cast on an accessible voting system should be cast by non-disabled voters. Whether a similar approach is workable here is, again, something best left to SBE to decide.

# III

## Conclusion

In summary, it is our opinion that the General Assembly, by prohibiting the use of a "segregated ballot," intended to prevent the certification of a voting system that, for voters with disabilities, creates ballots that are physically set apart or can be easily distinguished from the ballots cast by other voters. We conclude that SBE has three options for certifying voting systems that would not result in creation of a segregated ballot. The State Board could require all voters to use accessible machines. Alternatively, SBE could certify an accessible voting system for the sole use of disabled voters so long as (a) that system produces ballots that are identical to the ballots produced by non-accessible machines, and (b) all ballots, from whatever machine, are cast, counted, and stored together. Or, SBE could certify any accessible system so long as it establishes polling-place procedures to ensure that enough non-disabled voters will use the accessible system that the ballots of disabled voters cannot be identified as such. Any one of these approaches would enable SBE to protect the privacy of disabled voters. Which approach to take, and how to implement that approach, is within SBE's statutory discretion to determine.

Douglas F. Gansler
*Attorney General*

Sandra Benson Brantley
*Assistant Attorney General*

Adam D. Snyder
*Chief Counsel, Opinions & Advice*